714 P.2d 818

**STATE of Arizona, Appellant,**

v.

**Bobby Lee BUSH, Appellee.**

**No. 6559–PR.**

Supreme Court of Arizona, In Banc.

Feb. 3, 1986.

Stephen D. Neely, Pima Co. Atty. by Michael E. Owen, Deputy Pima Co. Atty., Tucson, for appellant.

Robert J. Sweeney, Tucson, for appellee.

CAMERON, Justice.

This is a petition for review of a memorandum decision of the court of appeals

that reversed the trial court's order granting a new trial. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 12–120.24 and Rule 31.19 Ariz.R.Crim.P., 17 A.R.S.

The issues to be resolved on review are:

1. Was the determination of the trial court that a new trial should be granted, on grounds of ineffective assistance of counsel, an abuse of discretion?

2. Did the state and the trial judge fail to insure appropriate security and decorum so as to affect defendant's rights to a fair trial, to counsel, and to compel the attendance of witnesses in his own behalf?

The facts follow. On Friday, 19 March 1982, the defendant, Bobby Lee Bush (Bush), argued with Julius Caesar Pollard (Junior) and barred him from reentering the Ponderosa bar, which was owned by Bush's mother. On Sunday afternoon, 21 March 1982, Bush and Junior argued concerning Junior's "being barred" from the Ponderosa. Later, that same day, Junior entered the Ponderosa with his friend John Shaw and again argued with Bush. During this argument, Junior was shot by Bush three times. One of the bullets severed the spine leaving Junior paralyzed. Several witnesses were present at the time of the shooting. Whether the shooting was justified as self-defense was a major issue at trial. There was testimony that a friend removed a gun from Junior's possession after the shooting.

According to uncontroverted affidavits included in the motion to vacate, friends and relatives of Junior Pollard actively attempted to intimidate the defendant, his counsel and defense witnesses during the fifteen months between the shooting and the commencement of trial. On 16 October 1982, defendant was severely beaten by Gil Nichols, Junior Pollard's half brother. Just prior to trial, the car of defendant's daughter was vandalized. The daughter, who had been working as bar maid on the day of the shooting, was scheduled to testify for the defense. Further, during the trial various acts of intimidation and prejudicial behavior were observed both in and out of the courtroom by several witnesses.

After a jury trial, the defendant was found guilty of aggravated assault. The trial judge sentenced him to the minimum sentence of five years.

On 18 October 1983, the trial court granted defendant's motion to vacate on the basis of inadequate representation of counsel and ordered a new trial.

The court of appeals reversed the order for new trial and reinstated the verdict and sentence. We granted defendant's petition for review.

## INEFFECTIVENESS OF COUNSEL

The state argued that the defendant should not be granted a new trial because the record fails to reveal demonstrable evidence of his counsel's ineffectiveness. The court of appeals agreed, finding that defendant's counsel did a number of things on defendant's behalf, such as cross-examining state witnesses, raising appropriate objections and disclosing over fifty defense witnesses *which indicated adequate assistance of counsel.*

Defendant alleges eleven specific examples of his counsel's ineffectiveness. Some of these include: mishandling of crucial testimony as to whether the victim was shot in the front or the back; subpoenaing and interviewing witnesses for trial as it progressed; failing to interview his medical expert until the day he was to testify; and failing to listen to the taped interview of a witness to which he had access for over one year. Such actions caused the trial judge to remark that he was having to allow defense counsel "to interview witnesses and prepare the case as [he went] along."

The trial judge in granting defendant a new trial stated:

But this was a case in which a skilled performance of defense counsel in presenting an adequate defense *of a minimal standard would have changed the outcome of this trial.*

There was a real question of self-defense. There was a question of provocation. There [were] all kinds of things in this case that [defense counsel] failed to do.

(emphasis added). And,

[T]here's very reasonable grounds that this defendant's Sixth Amendment rights to a fair trial have been violated, and that the attorney representing him just frankly wasn't prepared.

\* \* \* \* \* \*

Under the provisions of Rule 24.2, I find that, ... the conviction in this case is obtained in violation of the State of Arizona Constitution in that it violated the defendant's rights to a fair trial.

■ A determination as to effectiveness of counsel is to be made from the record. *State v. Gannon*, 130 Ariz. 592, 594, 638 P.2d 206, 208 (1981). The granting of a new trial by the trial court should not be reversed unless an abuse of discretion affirmatively appears. *State v. Jeffers*, 135 Ariz. 404, 426, 661 P.2d 1105, 1127 (1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); *State v. Hickle*, 133 Ariz. 234, 238, 650 P.2d 1216, 1220 (1982). The question is not what an appellate court would do if the motion was before it but whether the trial judge abused his discretion in ruling as he did.

■ In the instant case, the evidence of ineffectiveness of counsel is more than sufficient to support the trial judge's finding that the defendant was prejudiced by his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985), *cert. denied*, —— U.S. ——, 105 S.Ct. 2689 86 L.ED.2d 706 (1985); *State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984). We find no error.

## COURTROOM SECURITY AND DECORUM

According to affidavits, during the fifteen months between the shooting and the commencement of trial, friends and relatives of Junior Pollard engaged in a concerted effort to intimidate the defendant, his counsel and defense witnesses. Specifically, on 16 October 1982, the defendant was assaulted by Gil Nichols, Junior Pollard's half-brother. Defendant was thrown to the ground and kicked viciously in the head and face until Nichols was pulled off by a bystander. Defendant's front teeth were knocked out, and he suffered permanent damage to his eyesight. Despite a request by defense counsel that Nichols be prosecuted for the attack, no charges were brought. Nichols later testified for the State at defendant's trial.

Several days prior to trial at which defendant's daughter was to testify for the defense, her car was vandalized. The daughter was advised by police that suspects for the vandalism had been found but that she would not be permitted to know their names. Although the daughter had earlier told members of her family that "Daddy was protecting himself", when she testified at trial, she denied that she had witnessed the shooting.

During the seven-day trial, members of Junior Pollard's family were constantly present in the courtroom where they engaged in disruptive behavior such as laughing and making menacing faces during cross-examination by defense counsel. When counsel asked the court to restrain them, the court stated that he was in charge of the courtroom and that defense counsel should proceed with questioning.

At numerous points during the trial, members of Junior Pollard's family who were trial witnesses were observed leaving the courtroom and visiting a group of ten to fifteen friends of Pollard's who assembled each day on the couches on the sixth floor of the courthouse. This group of ten to fifteen individuals constantly engaged in "partying" behavior, sipping what appeared to be alcoholic beverages from styrofoam cups. During these visits, State's witnesses appeared to be exchanging information about testimony, contrary to the rule on exclusion of witnesses which had been invoked.

When defense counsel, defense counsel's secretary, the defendant or any defense witness entered the courthouse to attend trial, they would be met by three members of Junior Pollard's group who stationed themselves at each of the three doors to the courthouse, making menacing faces and gestures. The judge's bailiff and secretary described themselves as afraid to use the court restrooms because of the presence of the individuals on the ground floor and outside the courtroom.

On 28 July 1983, the case was submitted to the jury. At approximately 6:00 p.m. on that day, defense counsel and the defendant were summoned to the courthouse where, as before, all three entrances were "guarded" by members of Junior Pollard's group. Defense counsel and the defendant were allowed to enter, but the three individuals made menacing facial expressions, followed them and circled them menacingly as they proceeded to the elevators.

Upon reaching the sixth floor of the courthouse, defense counsel and the defendant observed the same party-type crowd sitting on the couches and, due to the extremely hostile environment, went directly to chambers. In chambers, the bailiff remarked to the judge that the group of individuals outside the courtroom seemed to be having a party. The trial judge responded by asking the bailiff to call security and have them moved to a different floor because he did not like such people being present in the courthouse after business hours. When the trial judge inquired whether these individuals were drinking, the bailiff stated that he did not know. Security was called and advised of the situation as well as of the fact that three individuals were hanging around on the first floor by the elevators.

During this discussion in chambers, the trial judge's court reporter interjected that, as a result of the group of people on the couches, she was afraid to use the ladies' restroom during recesses. A bailiff added that he had been approached by Junior Pollard's brother, who made menacing remarks to him until the bailiff advised the brother to stay away from him.

That evening, no verdict was returned, and defense counsel and defendant left the courtroom by a round about route in order to avoid Junior Pollard's group. The next day defense counsel received word that the jury had reached a verdict, and reported to the courthouse. Again, he was met by three Pollard supporters "covering" the three entrances to the courthouse. As counsel approached, these individuals began circling around menacingly. As the elevator door was closing, one of the individuals made a gesture with his hand, as if to represent a pistol being fired at defense counsel.

At the hearing on the motion to vacate, attorney Fleischman examined defendant's former defense counsel as follows:

Q. You described in your affidavit a series of circumstances outside this particular courtroom. Would you briefly relate what you saw out there?

A. Well, I saw a crowd of very hostile people. Mr. Bush and I on one occasion went down to the fifth floor to use the restroom due to this group being out there. They were laughing and joking. I think they were also intimidating some of Mr. Bush's relatives. I felt intimidated by them. I felt intimidated by the fact that they seemed to be at the entrance to the courthouse whenever we came and went. I was intimidated by them and it made me very angry throughout the trial and I think it maybe made me lash out at them during my closing argument.

Q. Who were these people?

A. Gil Nichols, I think John Shaw, and Mr. Pollard's younger brother were the particular ones. And there were some other ones who I was not familiar with.

Q. Did this cause you personal fear for your safety?

A. Yes, it did, and for Mr. Bush.

Q. Did that have any effect upon your representation of Mr. Bush?

A. I think it did. I think it made it a little bit difficult to concentrate on preparing my cross-examinations if when you leave the courtroom you have to be apprehensive. I think if affects your concentration. I didn't sleep well during the trial.

Although the trial judge stated "I observed the people in the courtroom during this trial and I didn't feel intimidated by them, and I'm sure the bailiff didn't either." The affidavits indicate that the witnesses and the defense attorney were intimidated.

Defendant argues that he was denied his sixth amendment rights to a fair trial, to counsel, and to compel witnesses in his behalf. He claims this denial arose because a lack of courtroom security and decorum allowed friends and relatives of Junior Pollard to create an atmosphere of fear and intimidation. He maintains that the intimidation felt by his attorney caused him to give defendant deficient representation, and further that witnesses would not testify on his behalf out of fear for their own safety.

■ The right to a fair trial, before an impartial jury, in a criminal prosecution is of constitutional magnitude and importance. U.S. Constitution, Amendment VI; Ariz. Const. art. 2 § 24; A.R.S. § 13–114. While this right does not require a perfect trial, the spirit of a "fair trial" is embodied in a solemn, disciplined courtroom where the search for truth and justice is unhampered by any feelings of fear, intimidation or revenge. *See State v. Stewart,* 278 S.C. 296, 295 SE.2d 627 (1982), *cert. denied,* 459 U.S. 828, 103 S.Ct. 64, 74 L.Ed.2d 65 (1982). Witnesses and other persons must feel safe, secure and unafraid as they enter an Arizona courthouse.

■ The trial judge must be diligent in seeking to ensure a fair and impartial judicial atmosphere. He has a duty to "maintain order and decorum in proceedings" heard before him. Ariz.R.Sup.Ct.Rule 81,

Canon 3(A)(2). Further, it is required that the "court shall exercise reasonable control ... (3) [to] protect witnesses from harrassment...." Ariz.R.Evid. 611(a)(3), ·17A A.R.S.. As the National Conference of The Judiciary on the Rights of Victims of Crime recommended: "Judges should use their judicial authority to protect victims and witnesses from harrassment, threats, intimidation, and harm." National Institute of Justice, Statement of Recommended Judicial Practices 11 (1983).

■ We believe the trial judge has the primary responsibility for controlling the conduct of spectators in the courtroom and the courthouse. If the conduct gets out of hand, the court may clear the courtroom and the courthouse of those who may be intimidating witnesses or other court personnel. This should be done with caution. The Sixth Amendment to the United States Constitution provides in part: "In criminal proceedings the accused shall enjoy the privilege of a speedy and public trial." The right to public trial has solid roots in the English common law. When and where it first sprouted is, however, a mystery. The right was not specifically mentioned before 1500. By 1565, as a result of the reaction to the Spanish Inquisition, the excesses of the English Court of the Star Chamber and the French monarchy's abuses of the letter d'cache, it was a part of the English common law. Whatever its roots, the right, particularly of a criminal defendant, to an open and public trial was recognized in the colonies as part of the common law of England and has been with us ever since. Today, 44 states specifically provide for the right to a public trial in their constitutions. Only three states, Massachusetts, New Hampshire, and Wyoming, have no provisions for a public trial either in their constitutions or by statute.

■ The Arizona Constitution art. 2, § 24 provides that the accused has a right to "speedy public trial" and Rule 77(d) Rules of Civil Procedure, 16 A.R.S., provides that "[a]ll trials upon the merits shall be conducted in open court...." Nevertheless, Rule 9.3 of the Rules of Criminal

Procedure, 17 A.R.S., states instances wherein witnesses and spectators may be excluded from the courtroom. We believe that in the instant case the offending spectators should have been removed from the courtroom and the courthouse and barred from further attendance at the trial.

The judge has the primary, though not exclusive, responsibility to insure that those who come into the courtroom behave properly. The prosecuting attorney, because of the availability of both knowledge and resources has the primary responsibility of insuring that witnesses will not be intimidated outside the courtroom. Failure to prevent this kind of intimidation, when known to him and where there is resulting prejudice, could result in a reversal of a conviction. In the instant case, we find it difficult to believe that the Pima County Attorney's office was not aware of the conduct of Junior Pollard's friends. The failure to prevent such conduct together with the deficiency in defendant's representation by counsel caused in part by this conduct mandates that the matter be retried.

The memorandum decision of the court of appeals is vacated, and the order for new trial is reinstated.

HOLOHAN, C.J., GORDON, V.C.J., and FELDMAN, J., concur.

NOTE: Justice JACK D. H. HAYS, J., did not participate in the determination of this matter.