IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

DEC 24 2012

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2011-0340 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARCUS DESHAUN TUCKER, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | |
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2011-0386 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLIFTON JAMES CUTTLER II, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | |
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2011-0391 |
| | ) | (Consolidated) |
| Appellee, | ) | DEPARTMENT B |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| ANDRE LAVELLE ARMSTRONG, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause Nos. CR20111012001, CR20111012002, and CR20111012003 (Consolidated)

Honorable Jane L. Eikleberry, Judge

VACATED AND REMANDED

---

Thomas C. Horne, Arizona Attorney General
  By Kent E. Cattani, Amy M. Thorson, and
  Nicholas Klingerman                                                Tucson
                                                    Attorneys for Appellee


Law Offices of Cornelia Wallis Honchar, P.C.
  By Cornelia Wallis Honchar                                         Tucson
                                              Attorney for Appellant Tucker


West & Zickerman, PLLC
  By Anne Elsberry                                                   Tucson
                                             Attorneys for Appellant Cuttler


Lori J. Lefferts, Pima County Public Defender
  By David J. Euchner                                                Tucson
                                           Attorneys for Appellant Armstrong

---

E S P I N O S A, Judge.

¶1        After an eight-day jury trial, appellants Andre Armstrong, Clifton Cuttler II, and Marcus Tucker were convicted of offenses arising from their agreement to commit a home invasion and were sentenced to terms of imprisonment. In their consolidated appeals, they all argue they were deprived of their constitutional right to a public trial. Armstrong separately challenges the sufficiency of the evidence supporting his conviction and the trial court's denial of his motions to sever his trial from that of his codefendants. Cuttler also contends the trial court erred in denying his motion to permit appointed counsel to withdraw. Although we find Armstrong's separate arguments to be

2

without merit, we agree that all the defendants were deprived of a public trial.[1]  We therefore vacate their convictions and sentences and remand for a new trial.

**Factual Background and Procedural History**

¶2	We view the facts in the light most favorable to upholding the jury's verdicts.  *State v. Gunches*, 225 Ariz. 22, n.1, 234 P.3d 590, 591 n.1 (2010).  This case arose from an undercover operation by Tucson police officers involving Armstrong, Cuttler, and Tucker (collectively "the defendants"), as well as Torson Diaz, who is not a party to this appeal.  Between December 2010 and March 2011, police officers posing as drug traffickers told Cuttler, Tucker, and Diaz they wanted to hire a "crew" to execute a home invasion and steal between ten and twenty kilograms of cocaine for resale.  They offered to supply weapons, bulletproof vests, and a vehicle for the job.  The three men agreed, and on March 15, 2011, they arrived at the appointed time at an arranged staging area, accompanied by Armstrong.  All four men reviewed the details of the plan, inspected the weapons, and tried on the bulletproof vests the undercover officers had brought.  Shortly thereafter, as the men prepared to leave to execute the plan, uniformed police officers arrived and arrested them.

¶3	The defendants were charged in a fifteen-count indictment, which later was condensed to allege only two counts against each defendant:  one count of misconduct involving body armor and one count of conspiracy to commit armed robbery, aggravated

---

[1]We need not address Cuttler's right to counsel argument in light of our resolution of the public-trial issue.

robbery, aggravated assault, or kidnapping. Diaz was found incompetent to stand trial, and the other three defendants were tried jointly over Armstrong's objections.

¶4 On the third day of trial, the trial court closed the courtroom to all members of the public except the press for the remaining proceedings, apparently in response to complaints by jurors about intimidating conduct by persons in the courtroom and possibly the court's own observation of such conduct. The court entered the closure order despite concerns raised by Armstrong, who asserted that his family members had not acted inappropriately, and Tucker, who argued that excluding everyone from the courtroom "may look prejudicial." The court also denied a subsequent motion for mistrial based on the argument the closure had violated the defendants' constitutional right to a public trial.

¶5 The trial court denied all three defendants' motions for a judgment of acquittal pursuant to Rule 20, Ariz. R. Crim. P., and Armstrong's and Cuttler's motions for a new trial. The jury found Cuttler and Tucker guilty of both counts of the indictment but found Armstrong guilty only of the body armor charge after it was unable to reach a verdict on the conspiracy charge as to him. Armstrong was sentenced to the presumptive prison term of ten years. Cuttler was sentenced to presumptive, concurrent prison terms, the longest of which was 15.75 years.[2] Tucker pleaded guilty to an additional charge of possession of a deadly weapon by a prohibited possessor and was sentenced to presumptive, concurrent prison terms, the longest of which was 15.75 years.

---

[2]Cuttler also was determined to be in violation of previously imposed conditions of probation. The trial court revoked probation and sentenced him to the presumptive prison term of 2.5 years on that conviction, to be served consecutively to his 15.75-year sentence in this case.

4

¶6        The defendants filed separate appeals, which we consolidated because all three contend they were denied the right to a public trial. We have jurisdiction pursuant to A.R.S. §§ 12-120.21, 13-4031, and 13-4033.

## Public Trial

¶7        Tucker, Cuttler, and Armstrong argue they were denied their constitutional right to a public trial when, during the third day of the eight-day trial, the judge closed the courtroom to all members of the public except members of the press, based on concerns that observers might have been photographing jurors and witnesses and giving them "looks." "Because the value of the public trial guarantee to the judicial system is incalculable, we carefully scrutinize any trial court order that denies, restricts or limits a defendant's right to a public trial." *Ridenour v. Schwartz*, 179 Ariz. 1, 3, 875 P.2d 1306, 1308 (1994). Whether a defendant has been denied a public trial is a constitutional question we review *de novo*. *See State v. Dann*, 220 Ariz. 351, ¶ 27, 207 P.3d 604, 613 (2009). The improper denial of a public trial constitutes structural error, *State v. Ring*, 204 Ariz. 534, ¶ 46 & n.16, 65 P.3d 915, 933-34 & 934 n.16 (2003), and, consequently, prejudice is presumed and need not be shown by the defendant.[3] *Waller v. Georgia*, 467

---

[3]Relying on *Peretz v. United States*, 501 U.S. 923 (1991), *Levine v. United States*, 362 U.S. 610 (1960), and *United States v. Christi*, 682 F.3d 138 (1st Cir. 2012), the state contended for the first time at oral argument in this court that the defendants forfeited review of the public-trial issue by failing to timely object to the courtroom closure. We note that structural error is "fundamental [in] nature" and generally "can be raised for the first time on appeal." *State v. Orendain*, 188 Ariz. 54, 55, 932 P.2d 1325, 1326 (1997). However, because we find the issue sufficiently preserved in this case, we need not determine whether it is possible to forfeit review of a trial closure merely by failing to object. *See State v. Fulminante*, 193 Ariz. 485, ¶ 64, 975 P.2d 75, 93 (1999) ("An

5

U.S. 39, 49-50 & 49 n.9 (1984); *State v. Valverde*, 220 Ariz. 582, ¶ 10, 208 P.3d 233, 236 (2009).

¶8 The United States and Arizona Constitutions guarantee a defendant in a criminal case a public trial. U.S. Const. amends. VI, XIV; Ariz. Const. art. II, § 24; *see Presley v. Georgia*, 558 U.S. 209, ___, 130 S. Ct. 721, 723 (2010) (*per curiam*) (Sixth Amendment right to public trial applicable to states); *see also* A.R.S. § 13-114(1).[4] A "public trial" is "a trial which is open to the general public at all times." *People v. Woodward*, 841 P.2d 954, 956 (Cal. 1992). Our system of justice places great importance on the public nature of criminal trials because "[o]penness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system." *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979). Accordingly, there is a presumption that criminal proceedings will be open to the public, and "[c]losed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501,

---

objection is sufficiently made if it provides the judge with an opportunity to provide a remedy.").

[4]Although the public also has a qualified constitutional and common-law right to attend court proceedings, *see Waller*, 467 U.S. at 44; *Ridenour*, 179 Ariz. at 3-4, 875 P.2d at 1308-09, the public has not challenged the closure in this case; we therefore limit our discussion to the right held by the defendants *qua* criminal defendants.

6

509 (1984) (*Press-Enter. I*).[5]  Nevertheless, both federal and Arizona courts have recognized that the right to a public trial may be limited under some circumstances.  *See, e.g.*, *United States v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir. 1989); *State v. Bush*, 148 Ariz. 325, 330-31, 714 P.2d 818, 823-24 (1986).[6]

**The *Waller* Test**

¶9        In *Waller*, 467 U.S. 39, the United States Supreme Court unanimously established a four-part test for determining whether a closure of criminal proceedings is constitutional.  Under that test,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48.  We are unaware of any Arizona authority that has applied this test.

¶10        In its answering briefs, the state argues *Waller* does not apply here because in that case, "everyone in the general public was apparently excluded" from the proceedings, including the press, whereas here the press was not barred from the courtroom.  Although the state is correct that in *Waller* the proceedings were closed to

---

[5]For a detailed discussion of the history of the right to a public trial, see generally *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564-74 (1980).

[6]Because the state and federal constitutional rights to a public trial appear to be coextensive, our references to the federal right apply to the state right as well.  *See State v. Casey*, 205 Ariz. 359, ¶ 8, 71 P.3d 351, 354 (2003) (clauses in Arizona Constitution usually interpreted in conformity with similar clauses of United States Constitution); *cf. Derendal v. Griffith*, 209 Ariz. 416, ¶ 13, 104 P.3d 147, 151 (2005) (in context of right to jury trial, article II, § 24 is Arizona's analog to Sixth Amendment of United States Constitution and thus construed consistently).

everyone, the Supreme Court announced a broad rule and did not restrict its application to cases in which the proceedings were completely closed. 467 U.S. at 42, 48-49. On the contrary, the test itself suggests the Court intended that it apply to any closure of a criminal trial, whether complete or partial, as the second element requires that any order excluding members of the public be "no broader than necessary" to protect the interest advanced by the proponent of the closure. *Id.* at 48. If the test applied only in cases of total closure, that requirement would be meaningless. *Cf. State v. Hoggatt*, 199 Ariz. 440, ¶ 13, 18 P.3d 1239, 1243 (App. 2001) (in context of statutory interpretation, courts constrained to avoid construction that "would render portions of statute superfluous and meaningless"). Thus, whether closure was partial or total is not a threshold question for determining whether the test applies, but rather a component of the test itself, used to determine whether the closure was no broader than necessary and, thus, constitutional under the circumstances.

¶11 The state contends *United States ex rel. Orlando v. Fay*, 350 F.2d 967 (2d Cir. 1965), is analogous to the situation before us and provides guidance here. In that case the Second Circuit Court of Appeals rejected the defendant's claim that he had been deprived of a public trial when the trial court initially excluded everyone from the courtroom and then readmitted only the press and members of the bar. *Id.* at 970. After noting the defendant's family and members of his union had attempted to intimidate and harass witnesses and otherwise disrupt proceedings, the circuit court determined the trial judge "had good reason to believe that many persons in the courtroom were acting so as to interfere with the orderly conduct of the trial." *Id.* Although *Fay* bears similarities to

this case in that the press was allowed to remain in the courtroom while other members of the public were excluded, we disagree with the state that it should guide our analysis here.

**¶12**  Decided in 1965, *Fay* predates *Waller* and most of the other Supreme Court authority establishing the modern framework for applying the public-trial guarantee. *See generally Presley*, 558 U.S. 209 (2010); *Press-Enter. Co. v. Superior Court*, 478 U.S. 1 (1986) (*Press-Enter. II*); *Waller*, 467 U.S. 39 (1984); *Press-Enter. I*, 464 U.S. 501 (1984); *Gannett Co.*, 443 U.S. 368 (1979). Moreover, the Second Circuit has applied the *Waller* test repeatedly since it was announced in 1984, even in cases of partial courtroom closures, further diminishing *Fay*'s persuasive value. *See Sevencan v. Herbert*, 342 F.3d 69, 75 (2d Cir. 2002) (*Waller* test only clearly established law for courtroom closures); *see also, e.g.*, *English v. Artuz*, 164 F.3d 105, 108 (2d Cir. 1998) (applying *Waller* to exclusion of defendant's family); *Guzman v. Scully*, 80 F.3d 772, 775 (2d Cir. 1996) (defendant's friends and family); *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994) (all members of public for portion of trial). Accordingly, we find the state's reliance on *Fay* misplaced.

**¶13**  Finally, although it appears no Arizona court has applied the *Waller* test in any context, many other jurisdictions have done so, even in cases of partial courtroom closures.[7] As the Hawai'i Supreme Court has observed:

---

[7]*See English*, 164 F.3d at 109-10 (public excluded during testimony of one witness); *United States v. Blanche*, 149 F.3d 763, 769-70 (8th Cir. 1998) (defendant's family excluded after defense rested); *United States ex rel. Morgan v. Lane*, 705 F. Supp. 410, 413-15 (N.D. Ill. 1989) (public excluded during testimony of juvenile witnesses),

9

> Although *Waller* addressed the *complete* closure of a trial to the public, federal and state courts have subsequently extended the *Waller* analysis to *partial* closures of trials, *i.e.*, both closure of a segment of the trial during which the testimony of one or more witnesses is elicited and closure limited to particular members of the public.

*State v. Ortiz*, 981 P.2d 1127, 1137 (Haw. 1999). For all the foregoing reasons, we conclude the *Waller* test applies to both complete and partial closures of Arizona criminal trials.

**Application of *Waller***

¶14 Applying *Waller*, we first consider whether there was an "overriding" interest that justified the closure order in this case.[8] Courts have generally upheld

---

*aff'd*, 897 F.2d 531 (7th Cir. 1990); *Renkel v. State*, 807 P.2d 1087, 1094 (Alaska Ct. App. 1991) (public excluded during testimony of minor victims); *State v. Ortiz*, 981 P.2d 1127, 1137 (Haw. 1999) (defendant's family excluded); *People v. Webb*, 642 N.E.2d 871, 874 (1994) (member of defendant's family excluded during part of venire proceedings); *Kendrick v. State*, 661 N.E.2d 1242, 1244 (Ind. Ct. App. 1996) (public excluded during testimony of one witness); *State v. Schultzen*, 522 N.W.2d 833, 836 (Iowa 1994) (applying *Waller* in "quasi-closure" of courtroom in which defendant's family hidden behind screen during portion of one child witness's testimony); *Watters v. State*, 612 A.2d 1288, 1293 (Md. 1992) (public prevented from entering courtroom during one morning of trial); *Commonwealth v. Cohen*, 921 N.E.2d 906, 918 (Mass. 2010) (general public, except defendant's family, excluded during four days of jury selection); *State v. Mahkuk*, 736 N.W.2d 675, 683-85 (Minn. 2007) (purported gang members, including members of defendant's family, excluded); *People v. Nieves*, 683 N.E.2d 764, 766 (N.Y. 1997) (members of defendant's family excluded during testimony of one witness); *State v. Washington*, 755 N.E.2d 422, 424 (Ohio Ct. App. 2001) (public excluded during testimony of one witness); *Commonwealth v. Penn*, 562 A.2d 833, 836 (Pa. Super. Ct. 1989) (same).

[8]Some federal appeals courts applying the *Waller* test have suggested that a permissible partial closure of the courtroom may be based on a lesser showing by the moving party than would be required for a complete closure. These courts have required the movant to demonstrate only a "substantial" interest rather than the "overriding" interest described in *Waller*. *E.g.*, *Garcia v. Bertsch*, 470 F.3d 748, 752-53 (8th Cir.

limitations on public access to criminal proceedings when there has been a need to protect victims, witnesses, or jurors from embarrassment or intimidation. *See, e.g.*, *Press-Enter. I*, 464 U.S. at 510-12 & n.10 (embarrassment of jurors); *State v. Smith*, 123 Ariz. 243, 249, 599 P.2d 199, 205 (1979) (embarrassment and emotional disturbance of rape victim); *see also* Ariz. R. Crim. P. 9.3(c) (court may exclude spectators to prevent embarrassment or emotional disturbance of witness). Here, the trial court closed the courtroom in order to prevent intimidation of jurors and witnesses and to prevent prejudice to the defendants. The court therefore articulated an overriding interest, and *Waller*'s first prong was met.

¶15        *Waller*'s second requirement, however, that any "closure must be no broader than necessary to protect [the] interest [advanced by the proponent of closure]," 467 U.S. at 48, was not met. First, the exclusion of the defendants' families along with the rest of the general public suggests the closure order was broader than necessary. The Supreme Court has noted a special concern for accommodating the attendance at trial of an accused's family members. *In re Oliver*, 333 U.S. 257, 271-72 & 272 n.29 (1948); *accord Vidal*, 31 F.3d at 69; *English*, 164 F.3d at 108; *see also Braun v. Powell*, 227 F.3d 908, 917 & n.6 (7th Cir. 2000) (collecting cases). Armstrong objected to the exclusion of

2006); *Sherlock*, 962 F.2d at 1356-57. *Contra, e.g.*, *Mahkuk*, 736 N.W.2d at 685 (declining to apply "different tests to complete versus partial closures"); *People v. Jones*, 750 N.E.2d 524, 529 (N.Y. 2001) (same). Because we conclude the interests described by the trial court in this case—protecting jurors and witnesses from intimidation and avoiding prejudice to the defendants—satisfy either standard, any distinction between them is immaterial here. We therefore need not address this issue and leave its resolution for another day.

11

his family, maintaining they had not taken any photographs. Tucker also informed the court that although his family members had not yet attended the proceedings, they did plan to attend later. He pointed out his family members could not have been among those acting inappropriately because they had not been present, yet the closure order nevertheless precluded them from attending.[9] Assuming some observers had taken photographs or had given "looks," it appears from the record the court's closure order was more extensive than necessary to protect the jurors' and witnesses' interests because there is no indication the defendants' families were involved. In light of the special concern for permitting the attendance of a defendant's family, the absence of any such evidence suggests their exclusion in this case was unnecessary and thus impermissible under the second part of the *Waller* test. *See Ortiz*, 981 P.2d at 1138 (trial court erred in excluding defendant's family "on a vague suspicion of wrongdoing, admitting that it 'd[id not] know which people are . . . being investigated'") (alterations in *Ortiz*).

¶16        Furthermore, the exclusion of a police witness also appears to have been unnecessary based on the trial court's express assumption that he had not been intimidating jurors or other witnesses. The court stated, "[L]et's just keep everybody out, and that includes the officer who is here and who testified earlier. . . . I don't think he's been playing with his cell phone, but if he has been, I don't want it to happen. . . . It's

_____

[9]This is an additional respect in which this case is distinguishable from *Fay*, 350 F.2d 967, upon which the state relies. In that case, the Second Circuit noted, "There was good reason for the judge to believe that the defendant's family and friends . . . were attempting to intimidate and harass witnesses and otherwise to disrupt the proceedings." *Id.* at 970. Here, by contrast, there is no record of such conduct by any member of the defendants' respective families.

just better to have everybody removed." Not only did the court fail to find that the officer had behaved inappropriately, it explicitly stated it believed this was not the case. Although we recognize excluding the officer stemmed from the laudable desire to be evenhanded, doing so after observing he apparently posed no threat to the privacy or safety of the undercover officers or the jury further rendered the closure order broader than necessary to protect those interests. *See State v. Washington*, 755 N.E.2d 422, 426 (Ohio Ct. App. 2001) (trial court's expression it would "rather be safe than sorry" insufficient to justify closure under *Waller* test); *cf. Bush*, 148 Ariz. at 331, 714 P.2d at 824 (finding extensive record of spectator misconduct and concluding "the *offending* spectators should have been removed from the courtroom") (emphasis added).

¶17            With respect to the third part of the *Waller* test, the record shows the trial court considered no alternatives to the closure it ordered, even though it appears alternatives were available that might have obviated any need for even a partial closure of the courtroom. Such measures could have included, for example, prohibiting cellular telephones and posting court personnel to observe courtroom attendees. Given the ubiquitous use of cell phones for a variety of purposes, including taking photographs, the public routinely could be excluded from trial if concerns about their use were sufficient to override a defendant's public-trial right. But the right cannot be so easily denied. *Cf. Presley*, 558 U.S. at ___, 130 S. Ct. at 725 (if broad risk of jurors overhearing prejudicial remarks from public were sufficient to override defendant's public-trial right, public could be excluded "almost as a matter of course"); *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn. 2007) ("closure . . . based on generalized gang expert testimony would allow

closure in virtually every trial involving allegations of gang involvement"; more specific findings required). Thus, employing safeguards such as disallowing the use of mobile phones in the courtroom or requiring observers to leave them with security officers might have struck a more precise balance between preserving the defendants' right to a public trial and protecting jurors and witnesses. The court therefore was required to consider such alternatives before closing the trial. *See Presley*, 558 U.S. at ___, 130 S. Ct. at 724-25 (trial court required "to consider all reasonable alternatives to closure" whether or not offered by objecting party). Although we generally would defer to a trial court's finding that such alternatives to closure were impracticable, the court's apparent failure to consider them in the first instance was error.

**¶18** Relying on *Ayala v. Speckard*, 131 F.3d 62, 71 (2d Cir. 1997), and *State v. Turrietta*, 258 P.3d 474, 479-80 (N.M. Ct. App.), *cert. granted*, 268 P.3d 47 (N.M. 2011), the state emphasizes that the trial court allowed the press to attend trial, thus effecting only a partial, rather than a complete closure of the courtroom and thereby satisfying its obligation to consider reasonable alternatives.[10] But we disagree with the state that such a generalized approach is permissible under *Waller*, particularly given the Supreme Court's directive that in deciding whether to close a trial, "the balance of interests must be struck with special care." 467 U.S. at 45. Rather, the decision must be based on the circumstances attending a closure; although instituting a partial closure might, in some

---

[10]The parties agreed at oral argument in this court that although the trial court's closure order did not include the press, no members of the press were present or attended the trial.

14

cases, satisfy a court's obligation to consider reasonable alternatives, it might not satisfy that obligation in other situations. *See, e.g.*, *McIntosh v. United States*, 933 A.2d 370, 378-79 (D.C. 2007) ("trial court failed to give proper consideration to reasonable alternatives," even though it "proposed a limited closure[] and defense counsel failed to provide much in the way of argument or alternatives"); *see also Commonwealth v. Penn*, 562 A.2d 833, 838-39 (Pa. Super. Ct. 1989) (trial court erred in failing to consider alternatives to closure of courtroom during testimony of one witness and to explain on record why alternatives would be impractical or inadequate). And, to the extent that a partial closure can constitute an alternative to closure, as suggested by the state, if the partial closure under consideration is not sufficiently limited to comply with *Waller*'s second requirement, the court must consider other alternatives. Here, as noted above, reasonable alternatives to closure existed but the court did not consider them as required by *Presley*. Accordingly, the third *Waller* requirement was not met.

¶19 Finally, the trial court's findings, as required under the fourth prong of *Waller*, were insufficient to support the closure order. Absent Arizona authority applying *Waller*, decisions from other jurisdictions offer guidance in determining whether trial court findings are "adequate." *Waller*, 467 U.S. at 48. And courts agree that "[b]road and general findings are insufficient to meet this requirement." *English*, 164 F.3d at 109; *see Waller*, 467 U.S. at 48; *see also Press-Enter. II*, 478 U.S. at 13-14 ("[P]roceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"), *quoting Press-Enter. I*, 464 U.S. at 510.

15

¶20     In *Guzman*, the Second Circuit Court of Appeals held the trial court had improperly "relied on the unsubstantiated statements of the prosecutor, rather than conducting an inquiry of the prosecution witness on whose behalf the closure request was made," and concluded it therefore had not made adequate findings to support closing the courtroom. *Id.* at 775. Similarly, in *Penn*, the Pennsylvania Superior Court concluded the trial court had failed to make adequate factual findings to support the limited closure of the courtroom during the testimony of a witness because "the trial court [had] made no findings whatsoever regarding the nature, extent, or impact of the alleged intimidation on [the witness]. 562 A.2d at 838, 840. The court found the trial court had "abused its discretion in failing to examine [the witness] for itself, *in camera* if necessary, in order to access [*sic*] his credibility and to determine the nature, extent, and impact of any attempts to intimidate [him] and prevent or alter his testimony." *Id.* at 838-39; *accord, e.g.*, *Mahkuk*, 736 N.W.2d at 685 (findings inadequate when trial court excluded alleged gang members from courtroom based on prosecutor's assertion without taking evidence from any witness regarding alleged intimidation).

¶21     These cases illustrate the level of specificity required with respect to the factual findings a trial court must make in order to satisfy the fourth part of the *Waller* test. Although an evidentiary hearing may not always be necessary, *see Sherlock*, 962 F.2d at 1359, a court cannot neglect to make findings altogether or base its closure order only on broad or general observations. *See, e.g.*, *Waller*, 467 U.S. at 48; *English*, 164 F.3d at 109; *Guzman*, 80 F.3d at 776; *Kendrick v. State*, 661 N.E.2d 1242, 1244 (Ind. Ct. App. 1996); *Carter v. State*, 738 A.2d 871, 877 (Md. 1999); *Mahkuk*, 736 N.W.2d at 685;

16

*Washington*, 755 N.E.2d at 425-26; *Penn*, 562 A.2d at 838-39; *see also People v. Clemons*, 574 N.E.2d 1039, 1041 (N.Y. 1991) ("[N]o closure 'can be tolerated that is not preceded by an inquiry careful enough to assure the court that the defendant's right to a public trial is not being sacrificed for less than compelling reasons.'"), *quoting People v. Jones*, 391 N.E.2d 1335, 1339 (N.Y. 1979), *aff'g* 557 N.Y.S.2d 179 (App. Div. 1990). "While the right to a public trial may certainly bow to interests in protecting witnesses from injury or intimidation in *some* cases, such an encroachment on a defendant's rights requires, *at a minimum*, that the trial court first determine whether or not the threat of injury or intimidation in fact exists." *Penn*, 562 A.2d at 839, *citing Waller*, 467 U.S. at 45. And, although a trial judge's own observations of spectator behavior could support closure of trial, the judge must make specific findings to comport with *Waller*.

¶22 Here, the factual findings the trial court made were too generalized to satisfy the *Waller* test. Although, as noted in our discussion of the first *Waller* requirement, we agree with the court's implicit conclusion that the interests here are "overriding," the court did not make a sufficient record to permit a determination of whether those interests were in fact threatened. *See Waller*, 467 U.S. at 48 (party seeking closure must advance interest likely to be prejudiced); *see also Press-Enter. I*, 464 U.S. at 510 (trial court must make "findings specific enough that a reviewing court can determine whether the closure order was properly entered"). And, as noted by another court addressing a similar issue, "An appellate court may not provide a post hoc rationale for why the trial judge would have closed the trial had it held a hearing and made findings." *Carter*, 738 A.2d at 878, *citing Waller*, 467 U.S. at 49 n.8.

¶23     The trial court stated it was concerned that observers "may be taking photographs of the jurors and/or the undercover police officers, either to intimidate them or for whatever purpose." But it did not identify on the record specific individuals who had alleged others had been engaging in improper conduct, stating only generally that "[t]he jurors have expressed some concerns."[11] Nor did the court question them about what they had observed; indeed, it acknowledged that it "didn't talk to the jurors" but explained instead that their "concerns [had been] communicated to the bailiff," who then apparently conveyed them to the court.[12] Additionally, judicial security officers examined the cellular telephones of many, albeit not all, observers and found no "relevant" photographs. Consequently, the record contains no testimony or evidence to support a finding that observers had been photographing witnesses or jurors. *See Mahkuk*, 736 N.W.2d at 685 (vacating conviction under *Waller* where record contained "no indication as to which specific witnesses had been intimidated or threatened," "no evidence from any witness asserting that a witness had been intimidated or threatened,"

---

[11]Such a record need not have been made in open court but could have been taken privately at the bench or *in camera*. *See Penn*, 562 A.2d at 839.

[12]It is unclear from the record whether the trial judge personally observed any spectator misconduct. At one point the judge suggested she had seen misconduct: "Some of the observers in the courtroom have been concerning me with their behavior. They've had cell phones out. I'm concerned that they may be taking photographs of the jurors and/or the undercover police officers, either to intimidate them or for whatever purpose." But the judge did not disagree with Tucker's attorney's later statement, "I believe my impression[] is correct, that the Court found out about this without your own personal observation in order to then advise the gallery before you made your decision." Although a judge's own observations of courtroom activity could support a closure order, *see McIntosh*, 933 A.2d at 377, such observations must be established on the record pursuant to *Waller*'s fourth requirement. 467 U.S. at 48.

18

and no "evidence indicating who specifically was intimidating or threatening witnesses"); *cf. Ortiz*, 981 P.2d at 1138 (trial court conducted *voir dire* of jurors to determine whether any tampering had taken place). Had the court specifically questioned the complaining jurors and preserved their testimony or statements on the record, it might have been able to identify the individuals who had engaged in the improper behavior, and thus also have been able to tailor its order more narrowly by excluding those individuals only. *See Bush*, 148 Ariz. at 330, 714 P.2d at 823 (court may clear courtroom of individuals who intimidate witnesses or other court personnel). This also could have allayed the court's concern about causing prejudice to the defense by excluding from the courtroom a group of observers that may have appeared to be associated with the defendants.

¶24 For the foregoing reasons, we conclude that three of the requirements set forth by the Supreme Court in *Waller* were not satisfied here. We place great importance on the protection of witnesses and jurors, and it is clear that here, as in *Fay*, "the situation which the trial judge faced was not fully reflected in the black and white of the stenographer's minutes." 350 F.2d at 972. Nevertheless, the closure of the courtroom, even in part, cannot be deemed constitutional unless the *Waller* requirements have been met. Bearing in mind the historical presumption of openness in criminal proceedings and the Supreme Court's warning that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," we conclude that the court's order in this case denied the defendants a public trial. *Presley*, 558 U.S. at ___, 130 S. Ct. at 725. Because the error is structural under *Waller*, 467 U.S. at 49-50 & 49

19

n.9, and *Ring*, 204 Ariz. 534, ¶ 46 & n.16, 65 P.3d at 933-34 & 934 n.16, the defendants' convictions and sentences must be vacated and this matter remanded for a new trial.

### Sufficiency of the Evidence for Armstrong's Conviction

¶25 Although we vacate Armstrong's conviction and remand for a new trial based upon the public-trial issue, we must address his sufficiency-of-the-evidence argument because, were we to agree with him that the trial court erred in denying his motion for a judgment of acquittal, his conviction would be reversed on that ground. *Burks v. United States*, 437 U.S. 1, 17-18 (1978). And, because the prohibition against double jeopardy "'forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding,'" *State v. May*, 210 Ariz. 452, ¶ 25, 112 P.3d 39, 46 (App. 2005), *quoting State v. Moody*, 208 Ariz. 424, ¶ 25, 94 P.3d 1119, 1133 (2004), the state would be barred from retrying him.

¶26 After the state rested, Armstrong moved for a judgment of acquittal on both counts, pursuant to Rule 20, Ariz. R. Crim. P., which motion the trial court denied. Armstrong renewed his motion as to his body-armor conviction after the jury rendered its verdicts, but the court again denied the motion. Armstrong contends the evidence was insufficient and the court reversibly erred because the state had "presented no evidence whatsoever that would allow a rational trier of fact to find proof beyond a reasonable doubt that [he] wore the body armor 'during the commission of any felony offense,'" as

required by A.R.S. § 13-3116.[13]  He does not dispute he wore a bulletproof vest, but contends there was insufficient evidence he had participated in a conspiracy while wearing it and therefore the evidence was necessarily insufficient.  He urges this court to accept his version of the events and conclude he was merely present when the other men conspired to invade the home.  Alternatively, Armstrong contends that, without an overt act, § 13-3116 does not apply when the underlying felony is conspiracy, and he maintains there was insufficient evidence of a nexus between the use of the vest and the underlying conspiracy.

¶27  We review the denial of a Rule 20 motion *de novo*.  *State v. West*, 226 Ariz. 559, ¶ 15, 250 P.3d 1188, 1191 (2011).  When reviewing a claim of insufficient evidence, we do not reweigh the evidence and determine whether we would have found the defendant guilty; rather, we will reverse a jury's verdict only if it is not supported by substantial evidence.  *State v. Garfield*, 208 Ariz. 275, ¶ 6, 92 P.3d 905, 907 (App. 2004).  "If reasonable persons could differ on whether the evidence establishes a fact at issue, that evidence is substantial."  *Id.*

¶28  Here, there was substantial evidence from which the jury could have found Armstrong had participated in the conspiracy.  Police officers testified that Tucker, Cuttler, and Diaz had planned to bring a fourth person to the pre-arranged meeting and, on the day of the meeting, they arrived with Armstrong.  Cuttler told one of the officers,

---

[13]Section 13-3116 provides, "A person commits misconduct involving body armor by knowingly wearing or otherwise using body armor during the commission of any felony offense."

who was undercover at the time, that he had spoken with Armstrong about the details of the plan to invade the home, and Armstrong had confirmed he "knew what was going on." Like his codefendants, Armstrong inspected the assault rifles and then donned a bulletproof vest. As one of the officers testified,

> It's the totality of the circumstances. He said, ["Y]eah, I know what's up.["] He said, ["S]afety first.["] He took off his tee shirt and put on a bulletproof vest. Twelve[-]and[-]a[-]half years being a police officer, I've never driven through a parking lot and watched someone who was not about to go commit a crime putting on a bulletproof vest under his tee shirt for no reason.

¶29 However limited Armstrong's participation in the conspiracy might have been, reasonable jurors could have found him criminally liable as a coconspirator based on the evidence presented. *See State v. Arredondo*, 155 Ariz. 314, 317, 746 P.2d 484, 487 (1987) (agreement primary focus of crime of conspiracy, and defendant's participation therein may be proven by minimal conduct). That the jury was unable to reach a unanimous verdict on the conspiracy count, resulting in a mistrial as to that count, does not mean Armstrong was entitled to a judgment of acquittal pursuant to Rule 20. As our supreme court has observed, the fact that a jury was unable to reach a verdict on one count does not "'make[] the existence of any fact . . . more probable or less probable'" on another count. *Yaeger v. United States*, 557 U.S. 110, 120-22 (2009), *quoting* Fed. R. Evid. 401. "[C]onjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." *Id.* From the evidence presented, rational jurors could conclude Armstrong was aware of the plan and participated in the conspiracy. It was for the jury,

not this court, to weigh the evidence based on its assessment of the witnesses' credibility. *State v. Lee*, 189 Ariz. 590, 603, 944 P.2d 1204, 1217 (1997). Thus, we will not reevaluate the evidence according to Armstrong's explanations. *In re John M.*, 201 Ariz. 424, ¶ 7, 36 P.3d 772, 774 (App. 2001).

**¶30**    Armstrong alternatively offers various statutory interpretations of § 13-3116 that he insists precluded his conviction.[14] He asserts, for example, § 13-3116 does not apply when the underlying felony is conspiracy and the state presents no evidence of an overt act. He also argues there was insufficient evidence establishing a "nexus" between the use of the vest and the conspiracy. The interpretation of § 13-3116 is a matter of first impression in Arizona, which we review *de novo*. *State v. Garcia*, 189 Ariz. 510, 513, 943 P.2d 870, 873 (App. 1997). "Our primary purpose in interpreting a statute is to give effect to the legislature's intent." *State v. Hinden*, 224 Ariz. 508, ¶ 9, 233 P.3d 621, 623 (App. 2010). In determining that intent, "'[w]e look first to the statute's language because we expect it to be the best and most reliable index of a statute's meaning.'" *Id.*, *quoting State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993). "'When the plain text of a statute is clear and unambiguous there is no need to resort to other methods of statutory interpretation to determine the legislature's intent because its intent is readily discernable from the face of the statute.'" *Estate of Braden*

---

[14]Although Armstrong failed to raise in the trial court, with as much specificity, all of the statutory-interpretation arguments that he now asserts on appeal, the record establishes the court considered the general issues he has raised; we therefore find them adequately preserved for appeal.

*ex rel. Gabaldon v. State*, 228 Ariz. 323, ¶ 8, 266 P.3d 349, 351 (2011), *quoting State v. Christian*, 205 Ariz. 64, ¶ 6, 66 P.3d 1241, 1243 (2003).

¶31 Section 13-3116(A) provides, "A person commits misconduct involving body armor by knowingly wearing or otherwise using body armor during the commission of any felony offense." Conspiracy to commit a felony requires "agree[ment] with one or more persons that at least one of them or another person will engage in conduct constituting . . . [a felony] offense" "with the intent to promote or aid the commission of [the] offense," and is classified as a felony offense. A.R.S. § 13-1003(A), (D). Section 13-1003(A) provides that "an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another." *See, e.g.*, *Evanchyk v. Stewart*, 202 Ariz. 476, ¶¶ 15, 17, 47 P.3d 1114, 1118-19 (2002) (conviction for conspiracy to commit first-degree murder requires neither overt act nor murder).

¶32 Armstrong maintains that conspiracy cannot be the underlying felony required by § 13-3116(A) when the conspiracy at issue does not require commission of an overt act. He relies on cases from other jurisdictions interpreting statutes that criminalize possession of a weapon during the commission of a felony offense, and urges us to adopt the reasoning of the Nevada Supreme Court in *Moore v. State*, 27 P.3d 447, 450 (Nev. 2001). There, the court held that, for sentencing purposes, the defendant could not be regarded as having used a deadly weapon to commit conspiracy because the conspiracy statute did not require an overt act and the conspiracy was completed when an agreement was reached to commit an unlawful act. Armstrong also points to a decision of the New Mexico Court of Appeals, which held a sentence-enhancement statute based

24

on the use of a firearm did not apply to the offense of conspiracy because "conspiracy is an initiatory crime which involves no physical act other than communication." *State v. Padilla*, 879 P.2d 1208, 1212 (N.M. Ct. App. 1994). He cites no Arizona authority interpreting Arizona's weapons-misconduct statute, A.R.S. § 13-3102(A)(8), in a like manner.

¶33 We agree with the state that Armstrong's interpretation of the statute is contrary to its plain language. Section 13-3116(A) unambiguously imposes criminal liability for wearing body armor during the commission of *any* felony offense, and the conspiracy charged in this case is a felony offense. *See Diefenbach v. Holmberg*, 200 Ariz. 415, ¶ 8, 26 P.3d 1186, 1189 (App. 2001) (when interpreting statute, no word should be rendered void). And even were we to find the cases Armstrong relies on instructive, both are distinguishable. As previously noted, the Nevada statute interpreted in *Moore*, 27 P.3d at 449-50, was a sentence-enhancement statute based on a defendant's use of a weapon "in the commission of a crime." Nev. Rev. Stat. § 193.165(1) (1995). Likewise, in *Padilla*, 879 P.2d at 1212, the court examined a New Mexico sentence-enhancement statute that provided for a one-year increase in the period of incarceration based on the use of a firearm "in the commission of a felony." N.M. Stat. Ann. § 31-18-16(A) (1993).

¶34 In both cases, the courts concluded it was not possible for a firearm to be used to commit an offense like conspiracy, which could be completed merely through communication and agreement. *Moore*, 27 P.3d at 450; *Padilla*, 879 P.2d at 1212. And both courts focused on the practical impossibility of *using* a weapon to commit

25

conspiracy. In contrast, § 13-3116(A) provides culpability not only for using body armor in the commission of any felony, but also for merely *wearing* body armor during commission of any felony. Whereas a gun cannot be "used" to conspire to commit a crime, body armor may be worn while conspiring to commit a crime. Giving effect, as we must, to the plain language of § 13-3116(A) as the unambiguous reflection of the legislature's intent, we cannot adopt Armstrong's far-reaching interpretation of the statute, which disregards that plain language.

¶35 Armstrong also asserts his conviction must be reversed because there was no nexus between the use of body armor and the conspiracy. He urges this court to analogize § 13-3116 to a charge for possession of a weapon during a felony offense under § 13-3102(A)(8). In support, he relies on *State v. Petrak*, which required a nexus between weapons misconduct and the underlying felony and held "[t]he state must prove that the defendant intended to use or could have used the weapon to further the felony drug offense underlying the weapons misconduct charge." 198 Ariz. 260, ¶ 19, 8 P.3d 1174, 1180 (App. 2000). Armstrong argues the body-armor statute is vague, and posits that, without requiring a nexus between the underlying offense and the use of the body armor, the resulting application of § 13-3116(A) in certain circumstances would be "absurd." Specifically, he contends a person could be convicted under the statute if he were wearing body armor for a medical reason, such as "lower back support," even though conspiring to commit a felony unrelated to the use or wearing of the armor. The state counters that whether an overt act is required or not, conspiracy is "an ongoing offense" and all that is required under the plain language of the statute is that at some

26

point during the commission of the conspiracy, "the body armor would have been used or have been available for use during the commission of a felony including conspiracy," and "such a nexus would exist."

¶36    In *Petrak*, this court interpreted the weapons-misconduct statute, which criminalizes knowingly "[u]sing or possessing a deadly weapon during the commission of any felony offense." § 13-3102(A)(8). Petrak had been convicted after a jury trial of, *inter alia*, misconduct involving weapons and possession of marijuana and paraphernalia; based upon drugs, paraphernalia, and guns discovered in his house and truck. *Petrak*, 198 Ariz. 260, ¶¶ 2, 4, 8 P.3d at 1176, 1177. We reversed his conviction for weapons misconduct in part because the trial court had failed to instruct the jury it was required to find a nexus between the guns and the drugs, specifically, that the "weapon was used or available for use or was intended to further the offense." *Id.* ¶¶ 19-20, 30. A nexus could be found based upon "the spatial proximity and accessibility of the weapon to the defendant and to the site of the drug offense," as well as other considerations. *Id.*

¶37    We agree with Armstrong that § 13-3116(A), which requires that the accused have used or worn body armor during the commission of a felony, is strikingly similar to § 13-3102(A)(8) and implies some relationship between the use of the body armor and the commission of the offense. But to the extent *Petrak* provides any guidance because of the similarity between the statutes, we find it does not suggest Armstrong is entitled to relief. Even assuming, *arguendo*, that there must be a nexus between the use of the body armor and the commission of the underlying felony and that the defendant

must have "intended to use or could have used" the body armor "to further the felony" of conspiracy, the evidence established that nexus here.

¶38 Contrary to Armstrong's assertions, the evidence at trial demonstrated he had worn the armor at the staging area where his coconspirators had agreed to meet immediately before committing the offenses that were the subject of the conspiracy. *See Petrak*, 198 Ariz. 260, ¶ 19, 8 P.3d at 1180. This is not the "absurd" situation Armstrong has envisioned in his brief on appeal, where a conviction could be obtained despite the fact there was no connection between a defendant's use of body armor and the underlying felony. Instead, the evidence established Armstrong donned the vest while participating in the staging of a home invasion—not that he wore it for some other, innocent reason unrelated to the conspiracy. Indeed, Armstrong's coconspirators had requested the vests and automatic weapons in order to successfully execute the objectives of the conspiracy. We conclude that, assuming a nexus was required, the state established it and presented sufficient evidence to support Armstrong's conviction.

**Denial of Armstrong's Motions to Sever**

¶39 Armstrong next asserts the trial court abused its discretion by denying his multiple motions to sever his trial from that of his codefendants, before, during, and after the trial. We review a trial court's severance ruling for an abuse of discretion, "in light of the evidence before the court at the time the motion was made." *State v. Blackman*, 201 Ariz. 527, ¶ 39, 38 P.3d 1192, 1202 (App. 2002). Armstrong argues severance of his trial from that of his codefendants was required because evidence admitted against them facially incriminated him, had a harmful "rub-off effect," and prejudiced him by the

28

significant disparity in the amount of evidence introduced against him as opposed to his codefendants. Although we vacate his conviction on the public-trial issue, we nevertheless consider the severance issue as it is likely to recur on remand.

**¶40** Defendants may be tried jointly when each "is charged with each offense included, or when the several offenses are part of a common conspiracy, scheme or plan or are otherwise so closely connected that it would be difficult to separate proof of one from proof of the others." Ariz. R. Crim. P. 13.3(b). Although joint trials may create some possibility of confusion, they are the rule rather than the exception in the interest of judicial economy. *State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995). Severance is required upon motion of a party, however, when "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz. R. Crim. P. 13.4(a). Trying multiple defendants jointly may be prejudicial when

> (1) evidence admitted against one defendant is facially incriminating to the other defendant, (2) evidence admitted against one defendant has a harmful rub-off effect on the other defendant, (3) there is significant disparity in the amount of evidence introduced against the defendants, or (4) co-defendants present antagonistic, mutually exclusive defenses or a defense that is harmful to the co-defendant.

*Murray*, 184 Ariz. at 25, 906 P.2d at 558. The burden rests on the defendant to demonstrate that the court's failure to sever caused "'compelling prejudice against which the trial court was unable to protect.'" *Id.*, *quoting State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983).

29

**Rub-Off Effect**

¶41 Armstrong first argues, as he did below, that the trial court should have severed his trial to protect him from the harmful rub-off effect of evidence admitted against his codefendants. He cites his codefendants' gun deals and drug usage, which occurred prior to his involvement in the conspiracy and which "plainly impl[ied he] was associated with these other offenses and cast[ him] as a career criminal who should not be released even if the jury thought the proof of any charged offense was lacking." He further argues "[he] had never surfaced anywhere in this investigation until his arrival at the meet on March 15, . . . only a couple minutes before the [police] takedown," and "he had no involvement in the conspiracy at the time most of the statements by Tucker, Diaz, and Cuttler were made."

¶42 "Rub-off" occurs when "'the jury's unfavorable impression of the defendant against whom the evidence is properly admitted influence[s] the way the jurors view the other defendant.'" *State v. Van Winkle*, 186 Ariz. 336, 339, 922 P.2d 301, 304 (1996), *quoting State v. Lawson*, 144 Ariz. 547, 555, 698 P.2d 1266, 1274 (1985) (alteration in *Van Winkle*). But "[m]ere introduction of evidence concerning one defendant's conduct that does not involve the other defendant generally does not constitute sufficient grounds for severance," *id.*, and a court is not required to sever a defendant's trial based on rub-off if under all circumstances the jurors are capable of following the court's instructions, keeping the evidence relevant to each defendant separate, and rendering a fair and impartial verdict as to each. *Lawson*, 144 Ariz. at 556,

698 P.2d at 1275; *see also State v. Grannis*, 183 Ariz. 52, 59, 900 P.2d 1, 8 (1995), *disapproved on other grounds by State v. King*, 225 Ariz. 87, 235 P.3d 240 (2010).

¶43       We see no abuse of discretion in the trial court's express finding that "the jury was able to separate the evidence out between the various defendants." During the presentation of evidence and during argument, the prosecutor and state's witnesses specifically clarified which events of the conspiracy had involved Armstrong. Demonstrative exhibits were prepared for this purpose and clearly specified which defendants had participated in each aspect of the conspiracy. And at the close of evidence, the court instructed the jury:

> [Y]ou must consider the charges against each defendant separately. Each defendant is entitled to have the jury determine the verdict as to each of the crimes charged based upon that defendant's own conduct and from the evidence which applies to that defendant as if that defendant were being tried alone. The State has the burden of proving beyond a reasonable doubt that each defendant committed the crimes with which he is charged.

The record reflects that proper instruction and presentation of evidence enabled the jury to weigh the evidence against each defendant in this case and effectively cured any potential prejudice due to rub-off. *See Murray*, 184 Ariz. at 25, 906 P.2d at 558 (with proper instruction, jury presumed to have considered evidence against each defendant separately in finding both guilty).

**Disparity of Evidence**

¶44       Armstrong also contends there was a significant disparity in the amount of evidence introduced against his codefendants when compared to the evidence introduced

against him. He argues the evidence presented at the joint trial "involved three months of investigation but only two minutes that included Armstrong. . . . [T]his trial would have lasted two days instead of nine days if Armstrong were tried alone."

¶45 Although Armstrong's involvement in the conspiracy was of shorter duration than that of his codefendants, even if a disparity of evidence exists, "severance is required only if 'the jury is unable to compartmentalize the evidence as it relates to separate defendants.'" *Grannis*, 183 Ariz. at 59, 900 P.2d at 8, *quoting United States v. Singer*, 732 F.2d 631, 635 (8th Cir. 1984). While the evidence established Armstrong had participated in only one transaction in furtherance of the conspiracy, namely, the staging of the home invasion, because the proof was compartmentalized and the jury was instructed properly, he has not sustained his burden on appeal of demonstrating he was prejudiced by the joinder of his case. *See Schaffer v. United States*, 362 U.S. 511, 515-16 (1960). Indeed, it is possible the disparity of evidence benefitted Armstrong; the jury may have looked more favorably upon him because of his comparatively limited involvement. *See Van Winkle*, 186 Ariz. at 339, 922 P.2d at 304.

**Facially Incriminating Testimony and Confrontation Clause**

¶46 Without citation to any specific trial testimony, Armstrong also asserts severance was required because evidence admitted against his codefendants facially incriminated him. *See Murray*, 184 Ariz. at 25, 906 P.2d at 558 (defendant prejudiced when evidence admitted against codefendant facially incriminating to him); *see also Bruton v. United States*, 391 U.S. 123, 126-28 (1968) (defendant facially incriminated when codefendant's confession implicated him). Armstrong refers generally to

32

"statements made prior to [his] alleged introduction into the conspiracy," arguing that unlike in a separate trial, where the state would have been required to present reliable evidence demonstrating his involvement in the conspiracy before introducing coconspirator statements against him, in the joint trial the jury heard about his codefendants' inculpatory statements prior to March 15. Therefore, he asserts he would have fared better in a separate trial because the pre-March 15 statements would have been precluded under *Crawford v. Washington*, 541 U.S. 36, 74 (2004).

¶47 First, we are not required to address Armstrong's concern that his codefendants facially incriminated him, because we generally do not consider arguments that are not supported by citation to the relevant portions of the record. *See* Ariz. R. Crim. P. 31.13(c)(1)(vi); *State v. Rumsey*, 225 Ariz. 374, n.4, 238 P.3d 642, 647 n.4 (App. 2010) (disregarding arguments not conforming to rule). Second, and in any event, our review of the record discloses no testimony by his codefendants that was facially incriminating to Armstrong. *See Bruton*, 391 U.S. at 126-28; *see also Grannis*, 183 Ariz. at 59, 900 P.2d at 8 (statements made by codefendant against own interest which did not specifically implicate defendant not facially incriminating), *citing Bruton*, 391 U.S. at 124-26. Indeed, both Tucker's and Cuttler's testimony, if believed by the jury, tended to absolve Armstrong: they denied knowing him before March 15, planning to pick him up for the meeting that evening, or discussing the conspiracy with him.

¶48 Additionally, we disagree that Armstrong would have successfully precluded admission of all non-hearsay statements of his coconspirators at a separate trial due to insufficient evidence he was involved in the conspiracy prior to March 15 or

33

contributed to the conspiracy at all. *See State v. Stanley*, 156 Ariz. 492, 495, 753 P.2d 182, 185 (App. 1988) (coconspirator statements admissible against defendant if state establishes, *inter alia*, existence of conspiracy and defendant's connection to it); *see also* Ariz. R. Evid. 801(d)(2)(E) (coconspirator statement non-hearsay if made in furtherance of conspiracy). As previously discussed, the state presented sufficient evidence of Armstrong's involvement in the conspiracy, specifically, the fact that his codefendants had told undercover officers they expected a fourth conspirator at the meeting and that Armstrong arrived at the pre-arranged location for the home invasion, confirmed his knowledge of the plan with undercover police officers, inspected the automatic weapons to be used during the offense, and donned a bulletproof vest. Armstrong cites no authority to support his contention that evidence of Tucker and Cuttler's activities before his involvement on March 15 was inadmissible against him under the Sixth Amendment's Confrontation Clause, and we are aware of none.[15]

¶49 Contrary to Armstrong's contention, even in a separate trial a defendant generally is not entitled to exclude a former codefendant's testimony, *Zafiro v. United States*, 506 U.S. 534, 540 (1993), and there is no requirement that a coconspirator's statement satisfy the Confrontation Clause to be admissible. *See Bourjaily v. United*

---

[15]At oral argument, Armstrong asserted *Crawford* supported his contention that in a separate trial any evidence of coconspirator activities that had occurred prior to his direct involvement in the conspiracy is precluded by the Confrontation Clause. 541 U.S. at 74 (Rehnquist, C.J., concurring in judgment). But we find no support for this theory in *Crawford*. *See id.* at 56. And in any event, Armstrong does not explain why out-of-court statements about events prior to his involvement in the conspiracy should be considered testimonial in nature. *See id*. at 59 (testimonial hearsay statements subject to Confrontation Clause).

*States*, 483 U.S. 171, 183-84 (1987); *see also* Ariz. R. Evid. 801(d)(2)(E) (coconspirator statements admissible non-hearsay when made during and in furtherance of conspiracy). However, the confession of a codefendant that inculpates the defendant may not be admitted without sufficient evidence to overcome the presumption against its unreliability. *See Cruz v. New York*, 481 U.S. 186, 193 (1987) (where non-testifying codefendant's confession incriminating defendant not directly admissible, also inadmissible during joint trial); *see also Lee v. Illinois*, 476 U.S. 530, 546 (1986) (codefendant's unreliable confession not admissible in joint trial). Although the admission of codefendants' confessions that inculpate the defendant would be barred if the codefendants did not testify, *Bruton*, 391 U.S. at 126-28, Armstrong has failed to identify any incriminating confessions. Finally, his contention that he may have fared better with a separate trial did not entitle Armstrong to severance. *See Zafiro*, 506 U.S. at 540.

¶50 Armstrong has not demonstrated "'compelling prejudice against which the trial court was unable to protect'" through means other than severance, such as providing jury instructions or precluding evidence. *See Murray*, 184 Ariz. at 25, 906 P.2d at 558, *quoting State v. Cruz*, 137 Ariz. at 544, 672 P.2d at 473. We therefore find no abuse of discretion in the court's denial of Armstrong's motions to sever his trial. *See State v. Mata*, 125 Ariz. 243, 245, 609 P.2d 58, 60 (1980) (where evidence admissible in either joint or separate trial, no abuse of discretion to deny severance and permit presentation of evidence); *State v. Mata*, 125 Ariz. 233, 238, 609 P.2d 48, 53 (1980) (same).

**Disposition**

**¶51**        For the foregoing reasons, we find no error in the trial court's denial of Armstrong's Rule 20 motions and severance requests.   However, because all three defendants were deprived of their constitutional right to a public trial, their convictions and sentences must be vacated, and this matter is remanded for retrial or other proceedings consistent with this opinion.


/s/ *Philip G. Espinosa*
PHILIP G. ESPINOSA, Judge

CONCURRING:


/s/ *Garye L. Vásquez*
GARYE L. VÁSQUEZ, Presiding Judge


/s/ *Virginia C. Kelly*
VIRGINIA C. KELLY, Judge