John L. McINTOSH, Appellant

v.

UNITED STATES, Appellee.

No. 00–CM–841.

District of Columbia Court of Appeals.

Argued Feb. 18, 2004.

Decided Oct. 4, 2007.

Billy L. Ponds, Washington, DC, for appellant. Harry Tun also entered an appearance for appellant.

Miriam A. Valoy, Assistant United States Attorney, for appellee. Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Asunción Cummings Hostin and Susan A. Nellor, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, Associate Judge, and KING and TERRY, Senior Judges.*

TERRY, Senior Judge:

After a non-jury trial, appellant was convicted of misdemeanor sexual abuse of a child[1] and was sentenced to a term of three years' probation. On appeal he contends that the trial court erred by temporarily closing the courtroom to the public during the testimony of the victim, J.J., a twelve-year-old girl who suffered from severe social disorders and borderline mental retardation and, in addition, exhibited physical discomfort while speaking in a courtroom setting. We conclude that the record does not provide sufficient support for the court's decision to close the courtroom, and accordingly we reverse appellant's conviction.

## I

### A. Preliminary Proceedings

Prior to trial, appellant challenged J.J.'s competency to testify. Appellant's challenge was based on a Children's Hospital record from 1997, which stated that J.J. "suffers from a depressive disorder, NOS [not otherwise specified], parent/child relationship problems, and borderline intellectual functioning," in addition to being hydrocephalic[2] and having attention deficit disorder and poor vision. The court held a hearing to determine whether J.J.'s limited mental capacity and psychological problems would interfere with her ability to tell the truth at trial. At that hearing, J.J.'s therapist, Carrie Trauth, testified that J.J. currently had the same diagnosis as she did in 1997, but that her condition did not affect her ability to tell the truth. Following Ms. Trauth's testimony, the court "accept[ed] the clinical opinion of Ms. Trauth that [J.J.] has nothing that interferes with

---

* Judge TERRY was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. D.C.Code § 22–4106 (1996), recodified as D.C.Code § 22–3006 (2001).

2. Hydrocephaly is "an abnormal increase in the amount of cerebrospinal fluid within the cranial cavity that is accompanied by expansion of the cerebral ventricles, enlargement of the skull and especially the forehead, and atrophy of the brain." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 589 (1989).

her ability from her mental health aspects ... to testify in this matter."

After both counsel gave their opening statements, the court conducted a further *voir dire* hearing at which J.J. herself testified. At the end of that hearing, the court concluded that J.J. "has an appreciation of the consequences of disobeying her oath, she has an understanding between what is true and what is false, what is fantasy and what is real, and she has sufficient though not perfect recollection as to remote and near memory." On the basis of those findings, the court found her "competent to testify," even though the court was aware that J.J. had anger management problems and mood swings that often surfaced in a group environment.

## B. *The Evidence of Sexual Abuse*

J.J. testified that on Friday morning, October 22, 1999, she accompanied her father ("Mr. J.") to the apartment of appellant, who was Mr. J.'s neighbor.[3] During that visit Mr. J. left the apartment to run some errands, and while he was gone, J.J. fell asleep on appellant's couch. She was awakened by her father's knocking on appellant's door. As J.J. awoke, she was alarmed to find her pants pulled down and appellant's fingers inside her vagina, "and so was his mouth." She immediately stood up and pulled up her pants, while appellant admonished her not to "tell anyone" or he would "use that" on her, pointing to a knife that was lying on a nearby table. He also offered J.J. twenty dollars to keep silent about the incident. After J.J. opened the door to let her father in, she and her father left and returned to his apartment. Once they were safely inside Mr. J.'s apartment with the door closed, J.J. told her father what had happened. Mr. J.

promptly called the police, and when they responded, they interviewed J.J. and then took her to Children's Hospital. A nurse who examined her at the hospital testified that she found redness at the entrance of J.J.'s vagina.

## C. *The Closure of the Courtroom*

The trial began on Thursday, February 24, 2000. After opening statements and with the courtroom open to the public, the government began its case in chief with the direct examination of the complainant, J.J. While on the stand, J.J. was very timid, often having to be reminded to speak louder and not to "worry about the other people." The court noticed that to help her maintain her composure and avoid these problems while on the stand, J.J. gripped "anger balls." In addition, whenever J.J. seemed distressed, the court sought to allay her discomfort. At the end of the day, the court noted during a bench conference that J.J. "seems to be uncomfortable with the excess people, so in the morning we'll try to have as few people here as possible.... She may in the morning with fewer people here be less uncomfortable."

The next morning, before resuming the direct examination of J.J., the prosecutor asked the court to close the courtroom during J.J.'s testimony:

> Ms. Hostin [the prosecutor]: Your Honor, we'd invoke ... again the rule on witnesses and ask that because we have a very young complainant in this case that has indicated a certain degree of, rather being uncomfortable with a lot of people in the courtroom, we'd ask that the Court clear the courtroom other than for people who are absolutely necessary.

---

**3.** J.J.'s parents did not live together. Ordinarily, J.J. lived with her mother in suburban Maryland during the week, but on this occasion she had stayed at her father's apartment in the District of Columbia the previous night.

THE COURT: Defense?

MS. SUMPTER [defense counsel]: Your Honor, the only people that I know of who are in the courtroom are people from my office and support people for Mr. McIntosh [appellant].

THE COURT: Are they necessary for the questioning of the witness?

MS. SUMPTER: No, they're not, Your Honor, but we would ask for them to be allowed to remain.

THE COURT: I will clear the courtroom. In balancing the matter relative to support for Mr. McIntosh and support for a 12–year–old child on the witness stand. I'll opt to support the 12–year–old child because she is, in fact, in a more vulnerable position. Clear it.

Defense counsel then asked the court to allow two attorneys to remain. Because the attorneys were not essential for the questioning of J.J., the court asked these attorneys to leave, and then said, "Courtroom is now cleared. Usually to clear the courtroom is to try to get a screen ... to protect the minor child in this type of case." After the courtroom had been cleared, the only persons present were the judge, the courtroom clerk, the prosecutor, defense counsel, defense counsel's supervisor, appellant, J.J.'s guardian *ad litem*, and J.J.'s parents.[4]

Despite these preparations, J.J. did not testify that day, Friday, February 25, because the court first needed to address some preliminary issues concerning the potential cross-examination of J.J. After these matters were resolved on Monday, February 28, the direct examination of J.J. continued in what may or may not have been open court (there is no reference in the transcript to clearing the courtroom).

During an extended bench conference near the end of that day's session, J.J.'s guardian *ad litem* asked the court if J.J. could leave the courtroom and go to the witness room because "she's looking a little anxious." The court agreed.

The next morning, Tuesday, February 29, the trial was again closed during J.J.'s testimony:

MS. SUMPTER: Well, actually, Your Honor, we just have a clarification question. Is the courtroom going to be open or closed while the witness is on the stand?

THE COURT: We're not going to have a lot of people here. What's your pleasure? I don't see—I see two people.

MS. HOSTIN: Your Honor, we'd ask that the courtroom be closed just for the tenancy [*sic*] of [J.J.'s] testimony.

THE COURT: Well, turn around and look at the people who are here.

MS. HOSTIN: Yes, Your Honor, we would ask that.

THE COURT: Well, okay then. Clear the courtroom. It's a child.

MS. SUMPTER: We would object.

THE COURT: I understand. It's a child talking about a sexual attack, alleged sexual attack—

MS. SUMPTER: It's an adult trial, though, Your Honor. . . . It's an adult trial, Your Honor, and we would request that it remain open.

THE COURT: Well, I could put her in another room and have her testify, so, and have her testify by telephone. I think having people not related to the case or necessary to the testimony step out. It's not an intrusion. In order to help this child to be comfortable in this proceeding.

---

**4.** There was no court reporter. The transcript in the record before us was prepared from a tape recording.

MS. SUMPTER: I'd ask that my objection be noted, Your Honor.

THE COURT: It is noted.... Would you step out until this witness is complete, then you can come in.

Later that day the prosecutor completed the direct examination of J.J., and the defense began its cross-examination.

The following morning, Wednesday, March 1, the court cleared the courtroom once again:

> All right, we're going to limit the number of people here during this child's testimony as I have been doing consistently throughout this trial. When this child is no longer on the witness stand, we will have a full open access courtroom.

Defense counsel again objected to the courtroom closure and asked permission for "a lawyer in our office" to stay. In denying that request, the court said:

> I understand your request. Just like I've put out the excess U.S. Attorneys, the extra other attorneys are out of here also. You just saw me—no, I said you could stay because you're their supervisor, but these two attorneys at this table [must leave].

J.J.'s cross-examination continued that morning. Following the luncheon recess, the prosecutor again asked for the courtroom to be cleared, and the court agreed.

When cross-examination of J.J. continued on Thursday, March 2, no request was made to clear the courtroom.[5] Nor was such a request made during redirect examination by the prosecutor or during the court's questioning near the end of that day. After J.J. finally left the stand, the courtroom was open to the public for the remainder of the trial.

5. It is not clear from the transcript why the prosecutor failed to request the clearing of the courtroom. It is possible, of course, that the

## II

Appellant argues that the closure of the trial to all persons not essential to either party while J.J. testified violated his Sixth Amendment right to a public trial. We are troubled by the court's all-too-quick assent to the government's request to close the courtroom entirely in these circumstances, and for the following reasons, we conclude that the court committed reversible error in doing so.

This court reviews a decision to close a courtroom temporarily during a criminal trial for abuse of discretion. *See Sobin v. United States*, 606 A.2d 1029, 1033 (D.C.1992) (although in some cases the "the trial court has the discretion to exclude particular individuals from the courtroom, the trial judge must specify the reason that justifies exclusion"); *State v. Guajardo*, 135 N.H. 401, 406, 605 A.2d 217, 221 (1992) ("the closure order was not an abuse of the trial court's discretion.").

The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." Public trials "serve many desirable purposes. The quality of testimony is improved, unknown witnesses may be induced to come forward, and the public has an opportunity to observe the judicial process.... [An open courtroom] discourages perjury and ensures that judges and prosecutors carry out their respective functions responsibly." *Sobin*, 606 A.2d at 1033 (citations omitted).

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure

court was already empty of individuals not essential to the case, but from the record before us we cannot tell.

knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I* ") (emphasis in original). In addition to protecting the accused, the right to a public trial protects "as much the public's right to know what goes on when men's lives and liberty are at state, for a secret trial can result in favor to as well as unjust prosecution of a defendant." *Lewis v. Peyton,* 352 F.2d 791, 792 (4th Cir.1965), cited with approval in *Kleinbart v. United States,* 388 A.2d 878, 882 (D.C.1978).

 This right to a public trial, however, is not quite absolute; trials, or parts of trials, may be closed to the public in very limited circumstances. "Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness.... '[T]he State's justification in denying access must be a weighty one.'" *Press–Enterprise I,* 464 U.S. at 509–510, 104 S.Ct. 819 (citation omitted). Thus the right has been limited in particular cases to enable the court to maintain order in the courtroom, to protect witnesses or parties, or to preserve confidentiality. *See Sobin,* 606 A.2d at 1033; *Nieto v. Sullivan,* 879 F.2d 743 (10th Cir.1989) (trial court temporarily closed courtroom while victim testified because victim was afraid to testify when co-defendants remained at large); *United States v. Sherlock,* 865 F.2d 1069

(9th Cir.1989) (defendant's family members temporarily excluded during child rape victim's testimony because they were mocking and intimidating her); *United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274 (2d Cir.1975) (trial closed to public while court received testimony of undercover agents).

 In considering whether the right to a public trial should be limited, "courts must always remain sensitive to the fact that 'it is only under the most exceptional circumstances that limited portions of a criminal trial may be even partially closed.'" *Kleinbart,* 388 A.2d at 882 (citation omitted). Before closing the courtroom, the trial judge must first hear the views of counsel, and then make a "proper determination [that] strict and inescapable necessity [compels] such a course of action. The closing of a trial to the public, without such a finding, is *per se* reversible." *Id.* at 883.

 In *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Supreme Court held that the closure of a suppression hearing to the public does not violate the defendant's Sixth Amendment right to a public trial if the test set out in *Press–Enterprise I* is met. *Id.* at 47, 104 S.Ct. 2210. After noting the similarities between suppression hearings and non-jury trials,[6] the Court concluded that the *Press–Enterprise I* standard applied to both. *Waller,* 467 U.S. at 46–47, 104 S.Ct. 2210. In balancing the right to a public trial and the yielding of that right to other interests, the Court adopted the following requirements:

> [(1)] the party seeking to close the [courtroom] must advance an overriding

---

**6.** Suppression hearings often resemble bench trials, in that in both types of proceedings "witnesses are sworn and testify ... counsel argue their positions ... [and] the outcome

frequently depends on a resolution of factual matters [by the judge]." *Waller,* 467 U.S. at 47, 104 S.Ct. 2210 (citation omitted).

interest that is likely to be prejudiced, [ (2) ] the closure must be no broader than necessary to protect that interest, [ (3) ] the trial court must consider reasonable alternatives to closing the proceeding, and [ (4) ] it must make findings adequate to support the closure.

*Id.* at 48, 104 S.Ct. 2210; *see Nellson v. Bayly,* 856 A.2d 566, 567 (D.C.2004). Viewing the record in the instant case in light of these *"Waller* factors," we conclude that only the first two requirements were satisfied, and that the third and fourth were not. We therefore hold that the partial closure of the courtroom during the complainant's testimony, both on direct and cross-examination, was unjustified.

 The first *Waller* factor required the prosecution to "advance an overriding interest that [was] likely to be prejudiced." *Waller,* 467 U.S. at 48, 104 S.Ct. 2210. In the case at bar, that interest was the protection of J.J. while she recounted the details of the sexual abuse she suffered. Even before *Waller,* the Supreme Court recognized that the government has a compelling interest in "safeguarding the physical and psychological well-being of a minor" sexual assault victim who is called upon to testify in a trial or hearing. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *accord, Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 9 n. 2, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II "*) ("The protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding"). This "compelling" interest, however, "does not justify a *mandatory* closure rule" because "the circumstances of the particular case may affect the significance of the interest." *Globe Newspaper Co.,* 457 U.S. at 607–608, 102 S.Ct. 2613 (emphasis in original).

Therefore, a trial court must "determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Id.* at 608, 102 S.Ct. 2613. The factors that the court should consider include "the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives." *Id.*

It does not appear from the record that the trial court considered these various factors, except to conclude that J.J. was "more vulnerable" than appellant. Nevertheless, we are satisfied that the prosecutor's comments were sufficient to "advance an overriding interest" in protecting J.J. from the emotional trauma that was likely to occur unless the court closed the courtroom while she testified. The court closed the proceedings only after observing during J.J.'s direct examination that J.J. was physically distressed when testifying. Before that, the court had become very familiar with J.J., having conducted an extensive *voir dire* of her and her therapist, so that it was able to witness J.J.'s distress at first hand. While on the stand on the first day of trial, and even during the *voir dire,* J.J. was very timid, often having to be cajoled into speaking louder and instructed not to "worry about the other people." The court was aware that J.J. had anger management problems and mood swings— in addition to her limited mental capacity and other psychological problems—which often surfaced in group environments, and that to help maintain her composure and avoid these problems while on the stand, she gripped "anger balls." Moreover, the court independently noticed J.J. manifesting signs of distress and sought to allay her discomfort several times. In balancing this information with the right of appellant to a public trial, it was reasonable for the court to conclude that J.J. would suffer "trauma and embarrassment" as a result of testifying in a public trial. Thus

we are satisfied that the first *Waller* requirement was met.

The second part of the *Waller* test requires that the closure be no broader than necessary to protect the interest that is likely to be prejudiced if the courtroom remains open. 467 U.S. at 48, 104 S.Ct. 2210. Here, the courtroom was closed only during J.J.'s testimony. In addition, the entire proceedings were recorded, and the trial transcript was and is available to the public. *See Bell v. Jarvis*, 236 F.3d 149, 168–169 (4th Cir.2000). Thus the second *Waller* requirement was met because the closure was no broader than necessary to protect J.J. from trauma and embarrassment.

Under the third *Waller* factor, a trial court must consider "reasonable alternatives" to closing the courtroom. 467 U.S. at 48, 104 S.Ct. 2210. However, the court is not required "to invent and reject alternatives to the proposed closure," especially when "faced with minimal, indeed perfunctory, opposition to a request that a courtroom be temporarily closed in a child sex abuse case while the victim testifies." *Bell*, 236 F.3d at 169 (citation omitted). The Fourth Circuit in *Bell*, in considering the third *Waller* factor, concluded that "a limited closure" was indicative of a trial judge who "considered the situation and determined the most appropriate means to balance the goal of protecting [the child witness] with [the defendant's] constitutional right to a public trial." *Id.* The court's conclusion was strengthened by defense counsel's failure to provide argument against or alternatives to courtroom closure. *Id.*

In the present case, when the government initially asked for the courtroom to be cleared, the trial court did not consider any alternatives before clearing the courtroom, despite opposition from defense counsel. However, J.J. did not testify on that day. Then, on the third day of trial, when the government requested that the courtroom be closed, the court said, "Well, okay then. Clear the courtroom. It's a child." Defense counsel objected, saying, "It's an adult trial, though, Your Honor . . . and we would request that it remain open." At this point, the trial court briefly considered but quickly rejected placing J.J. in another room and having her testify by telephone, ultimately concluding that "having people not related to the case or necessary to the testimony step out" was "not an intrusion." Defense counsel noted an objection for the record, but did not suggest any other alternatives to closure.

Thus here, as in *Bell*, the trial court proposed a limited closure, and defense counsel failed to provide much in the way of argument or alternatives. We cannot be confident, however, that the court adequately considered alternatives in light of defense counsel's consistent, albeit scant, opposition to closing the courtroom. The one alternative that was even mentioned, having J.J. testify by telephone from another room, appears to have been discounted because clearing the courtroom would not be "an intrusion" on persons with no involvement in the case, *i.e.*, the general public. As we have said, both the accused and the general public have an interest in open trials. On this record, however, there is little or no indication that the trial court considered such competing interests.

We recognize that *Waller* does not specifically direct trial courts to take into account the rights of the public when considering reasonable alternatives to courtroom closure. *See Waller*, 467 U.S. at 48, 104 S.Ct. 2210; *see also Bell*, 236 F.3d at 169 (considering only the interests of the defendant and the child witness). However, given the importance of the public's interest in public trials and open courtrooms, the trial court's stated basis for

closing the courtroom, *i.e.*, that it was "not an intrusion" on the public, strengthens our conclusion that the trial court failed to give proper consideration to reasonable alternatives.

■ The fourth and final *Waller* factor directs the trial court to make findings adequate to support the closure. 467 U.S. at 48, 104 S.Ct. 2210. "In light of the important interests at stake, the trial judge should always provide a statement of reasons for excluding particular persons from the courtroom, especially in the face of a defense objection." *Sobin*, 606 A.2d at 1034 & n. 6 (holding that the judge's stated reasons for excluding the defendant's young children from his sentencing hearing, though not "lengthy," were "adequate" to meet constitutional requirements). *Press–Enterprise I* similarly states that the findings must be "specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S. at 510, 104 S.Ct. 819; *accord, Kleinbart*, 388 A.2d at 883 ("When confronted with objection by appellant's counsel on Sixth Amendment grounds, the trial court refused to articulate reasons for [closing the trial] although requested to do so. Substantially more is constitutionally mandated...."). Our opinion in *McClinton v. United States*, 817 A.2d 844 (D.C.2003), while only briefly discussing the defendant's right to a public trial,[7] likewise cites the *Waller* require-

ment that a trial court's decision to close the courtroom be "based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 860.

■ In this case the trial court generally noted that J.J. was "in a more vulnerable position" and was "a child talking about a sexual attack." However, as the Supreme Court has made clear, such a finding, standing alone, "does not justify a mandatory closure rule." *Globe Newspaper Co.*, 457 U.S. at 608, 102 S.Ct. 2613. There is no indication in the record that there were large numbers of spectators in the courtroom; apparently, only lawyers and "support people" related to the case were ordered out. Nor is there anything to suggest that J.J. had reason to feel threatened (as there was in *Nieto*, 879 F.2d at 750 n. 11) or that persons in the courtroom were intentionally acting to make her feel uncomfortable (which is what happened in *Sherlock*, 865 F.2d at 1077). While this court need not ignore record facts that indicate the courtroom closure may have been justified by compelling reasons,[8] the initial burden remains on the trial court to explain its ruling, and to make sufficient factual findings, so that "the parties will better understand the court's decision, and a record will be made for appellate review." *Sobin*, 606 A.2d at 1034 n. 6. In this case, the court's general reference to the child's vulnerability is not

---

7. In *McClinton*, the trial court closed the courtroom temporarily after noticing the distressed behavior of a witness while she was on the stand and finding that she was intimidated by the number of spectators in the courtroom. On appeal, this court found no violation of the Sixth Amendment right to a public trial but did not specifically discuss whether the trial court met each of the *Waller* factors. *See* 817 A.2d at 860.

8. In *Tinsley v. United States*, 868 A.2d 867, 880 n. 19 (D.C.2005), we noted that nothing

in *Waller* requires a reviewing court to base its conclusions solely on the trial court's findings, as opposed to the rest of the record "which fully support[s] the decision and belie[s] a claim that the defendant's right to a public trial was actually violated by the closure." (quoting *Bell*, 236 F.3d at 172). While this may be true, it is not immediately apparent that the instant record "fully supports" the trial court's decision; thus we cannot be confident that appellant's Sixth Amendment right to a public trial was given due consideration.

sufficient to meet the fourth *Waller* requirement, nor does it show that the trial court adequately considered other important interests before ordering the courtroom closed.

For all of these reasons, we hold that the trial court's decision to close the courtroom during J.J.'s testimony violated appellant's Sixth Amendment right to a public trial. Appellant's conviction is therefore reversed, and the case is remanded for a new trial or for other proceedings consistent with this opinion.

*Reversed and remanded.*