IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

ROBERT GUY DAYTON JR.,
*Appellant*.

No. 2 CA-CR 2022-0087
Filed February 8, 2024

---

Appeal from the Superior Court in Pima County
No. CR20200910001
The Honorable Brenden J. Griffin, Judge

**REVERSED**

---

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Mariette S. Ambri, Assistant Attorney General, Tucson
*Counsel for Appellee*

Megan Page, Pima County Public Defender
By David J. Euchner, Assistant Public Defender, Tucson
*Counsel for Appellant*

**OPINION**

Vice Chief Judge Staring authored the opinion of the Court, in which Judge Sklar concurred and from which Judge O'Neil dissented.

---

S T A R I N G, Vice Chief Judge:

**¶1**        Defendant Robert Dayton Jr. was convicted of six counts of sexual conduct with a minor under the age of fifteen, as well as one count of indecent exposure to a minor under the age of fifteen. Dayton contends the trial court violated his constitutional right to a public trial when it excluded all "nonessential people" from the courtroom during a portion of the victim's testimony. Because the court committed structural error by closing the courtroom without satisfying the requirements set forth in *Waller v. Georgia*, 467 U.S. 39 (1984) — the test the state urged as the only one we should apply — we reverse Dayton's convictions and sentences. *See State v. Ring*, 204 Ariz. 534, ¶ 45 (2003) (structural error "automatically" results in reversal of guilty verdict); *State v. Hancock*, 240 Ariz. 393, ¶ 7 (App. 2016) ("Where error is structural, prejudice is presumed and reversal is mandated regardless of whether an objection [wa]s made below."). Given this reversal, we refrain from addressing Dayton's other arguments on appeal.

## Factual and Procedural Background

**¶2**        We view the facts in the light most favorable to sustaining the jury's verdicts and resolve all reasonable inferences against Dayton. *State v. Fierro*, 254 Ariz. 35, ¶ 2 (2022). Dayton was the sporadic boyfriend of S.K.'s mother, A.K., between 2014 and 2020. From 2018 to 2020, Dayton would frequently stay overnight at A.K.'s home in Sahuarita, Arizona. A.K. often worked overtime and would leave Dayton in charge of S.K. and her siblings for ten to twelve hours at a time.

**¶3**        Dayton rented a storage unit in South Tucson. He occasionally took S.K. with him to retrieve items from the storage unit. S.K. testified the first instance of sexual conduct had occurred in August 2019, when she was thirteen. Dayton took her to the storage unit and made her perform oral sex on him and have vaginal sex. S.K. testified sexual conduct then occurred multiple times at the storage unit. The sexual acts continued into the following year and began occurring in S.K.'s home.

¶4          During this time, S.K. began having behavioral problems and skipping classes and school assignments. She refused to talk to her mother about friends and ran away from home more than once. She also suffered from worsening depression.

¶5          In February 2020, S.K. told her grandmother, C.W., about Dayton's actions. S.K. became upset and frightened after telling C.W., and C.W. took S.K. to her Green Valley home. C.W. reported the abuse to authorities the next day. A sexual assault examination was performed on S.K., which revealed male DNA on the folds of skin where her thigh attached to her genitals. The DNA found during the examination matched the DNA profile later obtained from Dayton.

¶6          Dayton was indicted on eight counts of sexual conduct with a minor under fifteen and one count of indecent exposure to a minor under fifteen. After a five-day jury trial, he was acquitted of two counts of sexual conduct but convicted of the remaining charges. The trial court sentenced Dayton to six consecutive twenty-year prison terms for the sexual conduct convictions and a one-year consecutive term for the indecent exposure conviction—a combined total of 121 years. This appeal followed. We have jurisdiction pursuant to article VI, § 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

**Discussion**

¶7          Dayton argues the trial court committed structural error by closing the courtroom to "non-essential people" during S.K.'s testimony, in violation of his right to a public trial as guaranteed by the United States and Arizona Constitutions. "We review both constitutional and structural error claims de novo." *Hancock*, 240 Ariz. 393, ¶ 7. We defer to the court's factual findings, but we review de novo its ultimate legal determination. *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118 (1996).

¶8          The United States Constitution and the Arizona Constitution guarantee a criminal defendant the right to a public trial. *See* U.S. Const. amend. VI; Ariz. Const. art. II, §§ 11, 24; *Presley v. Georgia*, 558 U.S. 209, 211-12 (2010) (Sixth Amendment right to public trial applies to states). "A 'public trial' is 'a trial which is open to the general public at all times.'" *State v. Tucker*, 231 Ariz. 125, ¶ 8 (App. 2012) (quoting *People v. Woodward*, 14 Cal. Rptr. 2d 434, 436 (1992)). Because "the value of the public trial guarantee to the judicial system is incalculable," we carefully scrutinize any court orders that deny or restrict public access to a trial. *Ridenour v. Schwartz*, 179 Ariz. 1, 3 (1994).

¶9        The denial of a public trial is one of the "relatively few instances" that are regarded as structural error. *Hancock*, 240 Ariz. 393, ¶ 7 (quoting *Ring*, 204 Ariz. 534, ¶ 46). Structural errors "deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Ring*, 204 Ariz. 534, ¶ 45 (quoting *Neder v. United States*, 527 U.S. 1, 8-9 (1999)). Structural errors require reversal as a matter of law. *Hancock*, 240 Ariz. 393, ¶ 7.

¶10        A criminal defendant's right to a public trial is not absolute, however. *See Waller*, 467 U.S. at 45 ("[T]he right to an open trial may give way in certain cases to other rights or interests . . . ."); *Tucker*, 231 Ariz. 125, ¶ 8 ("[B]oth federal and Arizona courts have recognized that the right to a public trial may be limited under some circumstances."). "Courts have generally upheld limitations on public access to criminal proceedings when there has been a need to protect victims, witnesses, or jurors from embarrassment or intimidation." *Tucker*, 231 Ariz. 125, ¶ 14. *See* Ariz. Const. art. II, § 2.1(A)(1) (victim has the right "[t]o be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process"). *But see Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 610 (1982) (mandatory closure of sex crime trials involving minor victims violated First Amendment).

¶11        In *Tucker*, we determined the test set forth by the Supreme Court in *Waller* "applies to both complete and partial closures of Arizona criminal trials." 231 Ariz. 125, ¶ 13. Under that test, to overcome the "presumption that criminal proceedings will be open to the public," *id.* ¶ 8, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; the closure must be no broader than necessary to protect that interest; the trial court must consider reasonable alternatives to closing the proceeding; and the court must make findings to support the closure," *KPNX-TV Channel 12 v. Stephens*, 236 Ariz. 367, ¶ 11 (App. 2014) (quoting *Waller*, 467 U.S. at 48); *Tucker*, 231 Ariz. 125, ¶ 9. The elements of the *Waller* test are conjunctive; all of them must be satisfied. 467 U.S. at 48; *Presley*, 558 U.S. at 213-16.

¶12        S.K. testified on the second day of trial. She was sixteen years old at the time and had never testified in court. The court allowed S.K.'s personal service dog, which "helps her with anxiety and anticipating anxiety attacks and calming her," to sit beside her, outside the view of the jury. She stated she was "a little nervous" and testifying in court was "a little scary." The state began asking S.K. about her first sexual encounter

with Dayton, and when asked to describe what had happened, she did not verbally respond initially. The state asked her whether "this [was] hard to talk about," and S.K. nodded her head before saying, "Yes," and indicating she "need[ed] a minute." After eliciting testimony from S.K. that Dayton had taken her to a storage unit and told her to take off her clothes, the state asked S.K. what had happened next. S.K. indicated she was having difficulty remembering details. S.K. testified Dayton had "[t]old [her] to get on [her] knees and start," after which the transcript indicates she trailed off. The state asked S.K. if it was "difficult to say out loud," and S.K. again responded, "Yes." The state told S.K. to take her time, and S.K. indicated she needed some water.

¶13        When questioning resumed, S.K. began to speak softly and mumble. The state asked S.K. if Dayton had said anything else to her, and she testified he had told her to "suck his D word" before stating she did not "want to say" what Dayton had told her. S.K. further testified Dayton had "put his penis in [her] mouth," and when the state asked her what had happened after that, S.K. did not respond. The state asked S.K. if she needed to take a break, and S.K. nodded her head and said, "Yeah." The state asked the trial court if S.K. could take a break, and the court agreed.

¶14        Outside the presence of the jury, the state requested that, "[g]iven the nature of the testimony" and "how [S.K.] is struggling," the trial court remove "any unnecessary parties" from the courtroom "to limit the number of people that have eyes on her in terms of comfort level and that nature." Dayton objected, arguing the "courtroom is not ch[oc]k full of people. There is a long-standing public policy, as well as it's part of due process, to hold open a public court." Defense counsel continued, "I know sometimes judges will have everyone leave if there [are] exploitive images shown, that's not the case here. In addition, we are not broadcasting over YouTube anymore. So in light of those considerations, I would object." Finally, in the event the court granted the state's request, counsel asked the court to allow his paralegal to remain in the courtroom as "part of [his] staff." The state did not object to this request.

¶15        The trial court asked the state whether S.K. had said that removal of unnecessary parties "would help her in this situation," and the state responded, "Not specifically, but right now she is nodding her head. I have had conversations with her prior to this asking her . . . you know, who do you want in the courtroom? Would it be easier if there are less people? And she has said that to me before." The court noted that it had seen S.K. nod her head and granted the state's request, "through the victim,

that any nonessential people in the courtroom be excluded from the courtroom during her testimony." It further stated that if "there is anybody that is excluded from the courtroom that would like to participate either by streaming or by video, let [the] bailiff know when she's asking you to leave and we will try to set that up, and she will let you know how you can do that." The bailiff reported that four people in the courtroom requested access to a live stream of S.K.'s testimony.

¶16        After the bailiff informed the trial court that streaming had been activated, the state again resumed its direct examination of S.K. When S.K.'s testimony concluded, the live streaming was turned off and the courtroom was reopened. It is unclear from the record whether the live stream included video or was only audio, and the parties were unclear on this point when asked about it at oral argument in this court.

¶17        Dayton asserts the trial court erred in closing the courtroom to "non-essential people" without engaging in a sufficient analysis to determine if the closure satisfied the four elements of the *Waller* test. In response, the state initially argued that before applying *Waller*, courts "must first assess whether the conditions constitute a complete, partial, or . . . 'de minimis' closure." At oral argument in this court, however, the state withdrew its argument that the closure was de minimis or otherwise constitutionally irrelevant, repeatedly requesting that we not address those questions. Instead, the state elected to proceed relying entirely on its argument that the requirements of *Waller* were fully satisfied.

¶18        There is little Arizona law applying *Waller*'s four-part test to determine the constitutionality of a courtroom closure in a criminal case. *See Tucker*, 231 Ariz. 125, ¶ 13 ("[I]t appears no Arizona court has applied the *Waller* test in any context . . . ."). In determining whether the *Waller* test was satisfied here, we examine each element below.

## I.   First *Waller* Element

¶19        Before a courtroom is closed to the public, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced." *Waller*, 467 U.S. at 48. The physical and psychological well-being of a victim of a sex crime may be an overriding interest. *Globe Newspaper Co.*, 457 U.S. at 607; *State v. Smith*, 123 Ariz. 243, 249 (1979) ("[P]rotection of the dignity of the complaining witness in a rape case is a substantial justification for excluding spectators."); Ariz. R. Crim. P. 9.3(c); Ariz. Const. art. II, § 2.1(A)(1). "The ordeal of describing an unwanted sexual encounter before persons with no more than a prurient interest in it

aggravates the original injury," and "[m]itigation of the ordeal is a justifiable concern of the public and of the trial court." *Smith*, 123 Ariz. at 249-50 (quoting *United States ex rel. Latimore v. Sielaff*, 561 F.2d 691, 694-95 (7th Cir. 1977)).

¶20 Dayton argues the state's assertion that S.K. "would be 'more comfortable' testifying with only essential people in the courtroom" was insufficient to satisfy the first *Waller* element, which requires specificity. *See* 467 U.S. at 48. Dayton asserts neither the state nor the trial court mentioned S.K.'s "embarrassment or intimidation" as a reason for the closure. He further argues the state did not mention, and thus the court did not consider, S.K.'s age or maturity, her desires, or the interests of her parents, citing *Globe Newspaper Co.*, 457 U.S. at 608 ("trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim" by weighing factors including the "victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives").

¶21 The state counters that the trial court's order was based on an overriding interest, as "[t]he circumstances clearly indicate . . . that the court issued the order to prevent the minor victim from suffering embarrassment or emotional disturbance by testifying to embarrassing details in front of spectators." The state admits the court "did not make express findings in support of its decision" but asserts "the record here is sufficiently detailed such that this Court can determine the compelling interests at stake." In support of its argument, the state points to the court's knowledge of S.K.'s age, anxiety attacks, nervousness about testifying in court, difficulty describing details of Dayton's sexual conduct, and indication that testifying would be easier if there were fewer people in the courtroom.

¶22 Dayton disagrees with the state's assertion that we may infer findings of fact and conclusions of law reasonably supported by the record. He argues that, "[w]hile this is true in other contexts, when reviewing the constitutionality of a partial closure of the courtroom during trial, the State bears the burden of proving its necessity and substantiating that finding with evidence."

¶23 The first element of *Waller* requires only that an "overriding interest" justifying closure is articulated "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." 467 U.S. at 45 (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (*Press-Enter. I*)); *see Tucker*, 231 Ariz. 125, ¶ 22.

Further, the first *Waller* element does not require that the state prove the necessity of closure or even that the trial court make its findings explicit. *See Tucker*, 231 Ariz. 125, ¶¶ 4, 14 (court's implicit interest in protecting jurors from intimidation satisfied first *Waller* element). Indeed, at oral argument in this court, Dayton acknowledged that compliance with *Waller* does not require the use of any specific language.

¶24 Here, however, neither the state nor the trial court made a meaningful record concerning the presence of an overriding interest. Nothing in the record suggests either the state or the court engaged in any *Waller*-based analysis—including with regard to overriding interest. Neither the state nor the court explicitly mentioned the victim's embarrassment or psychological well-being when discussing whether closure of the courtroom was appropriate. Nor did the court balance those interests against Dayton's right to a public trial. *See Press-Enter. I*, 464 U.S. at 510 (requiring that closure be "essential to preserve *higher values*") (emphasis added). The entire discussion of the request for closure, which encompassed approximately two pages of the trial transcript, focused on the number of people in the courtroom without any indication of how many people were actually present, whether any were Dayton's family members, or whether any were members of the media. *See Tucker*, 231 Ariz. 125, ¶ 15 ("The Supreme Court has noted a special concern for accommodating the attendance at trial of an accused's family members."); *see also* Ariz. R. Crim. P. 9.3(c) (court may "exclude all spectators, *except news media representatives*, during a witness's testimony . . . to protect the witness from embarrassment or emotional disturbance" (emphasis added)). The court merely employed the term "nonessential" to describe the people who had to leave without defining what the term meant or otherwise indicating the persons to whom it applied. Accordingly, unless we conclude the undeniable difficulty of testifying to details as a minor victim of a sex crime categorically suffices as an overriding interest justifying closure—an approach rejected by the Supreme Court in *Globe Newspaper Co.*, 457 U.S. at 610—the record here is insufficient to establish an "overriding interest . . . likely to be prejudiced" absent closure. *Waller*, 467 U.S. at 48. The first element of *Waller* was not satisfied.

## II. Second *Waller* Element

¶25 The second *Waller* element requires "the closure . . . be no broader than necessary to protect" the interest advanced. *Id.* Dayton appears to contend the closure in this case was broader than necessary because "there were not many people in the courtroom" and only four

observers requested live streaming access after the closure. He asserts that, "compared to the large number of necessary people in the courtroom . . . four extra people is insignificant," and removing "a few 'unnecessary' people was never likely to fix the problem." Additionally, Dayton asserts, despite the court's exclusion of "non-essential people," S.K. "continued to have trouble remembering things and was unwilling to say 'vagina' and needed to take another break."

¶26      The state responds "it is unclear how many observers were removed from the courtroom," and the record reflects only that "four decided to watch the livestream." It also contends, contrary to Dayton's assertion, the *Waller* analysis does not require the closure of the courtroom to have fixed the problem for the order to have been proper.

¶27      We agree *Waller* does not require that the court closure be successful in fulfilling the interest advanced. *See id.* But, as noted in our discussion of the first *Waller* element, for example, the record is insufficient for us to determine whether any of Dayton's family members were excluded, *see Tucker*, 231 Ariz. 125, ¶ 15. Therefore, we are unable to conclude whether the trial court's closure of the courtroom during S.K.'s testimony was no broader than necessary. *See Waller*, 467 U.S. at 48; *see also Presley*, 558 U.S. at 215 ("Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."). The second *Waller* element was not satisfied.

## III. Third *Waller* Element

¶28      To satisfy the third *Waller* element, "the trial court must consider reasonable alternatives to closing the proceeding." 467 U.S. at 48; *see Press-Enter. I*, 464 U.S. at 511. And a court must consider alternatives to closure regardless of whether the parties suggest them. *Presley*, 558 U.S. at 214. Alternatives may include "closing only those parts of the hearing that jeopardized the interests advanced." *Waller*, 467 U.S. at 48-49.

¶29      Dayton argues the trial court failed to consider alternatives to closure, proposing for the first time on appeal alternatives including "closing the court for only th[e] portion of [S.K.]'s testimony on direct and cross examination that involved sexual matters." Further, he contends the court failed to consider excluding "only certain people" who might have been making S.K. "uneasy" during her testimony "about sexual matter[s]," such as "her mother or grandmother or other close family members, or those on [Dayton]'s side." And, Dayton asserts, although the court made a live stream of S.K.'s testimony available "to those who asked," it "did not

consider whether others might show up during [S.K.]'s lengthy testimony or how to make the trial available to them."

**¶30** The state argues the trial court not only considered, but adopted, an acceptable alternative to closing the courtroom during S.K.'s testimony by agreeing to live stream the testimony to the public in another room, citing *KPNX*, 236 Ariz. 367, ¶ 17. The state points to Dayton's objection that the court was "not broadcasting over YouTube anymore" and the court's apparent response to that assertion by making live streaming available.

**¶31** Dayton counters the state's reliance on *KPNX* "to suggest that this court approved of . . . livestreaming as a permissible alternative under the Sixth Amendment" is misplaced because, in that case, our analysis was focused on Rule 9.3(b), Ariz. R. Crim. P., and not the Sixth Amendment. He asserts that "[f]inding error in disallowing the media to observe even by livestream in one case does not mean that allowing livestream viewing without access to the courtroom is proper."

**¶32** Like the case before us, *KPNX* involved review of a trial court's closure of a courtroom. 236 Ariz. 367, ¶¶ 3-5, 15. There, the trial court granted the defendant's motion to close the courtroom to the press and public during her testimony in the penalty phase of trial. *Id.* ¶¶ 3-5. Accepting special action jurisdiction, we noted the court's application of the *Waller* elements and concluded its suggested alternative to closure— "having the press and public view [the defendant's] testimony from a different courtroom"—satisfied Rule 9.3. *Id.* ¶¶ 2, 10-17. Rule 9.3(b) provides, "All proceedings must be open to the public, including news media representatives, unless the court finds, on motion or on its own, that an open proceeding presents a clear and present danger to the defendant's right to a fair trial by an impartial jury." As Dayton argues, however, we did not resolve *KPNX* on constitutional grounds; there was simply no need for us to complete a full constitutional analysis there when the circumstances did not create a "clear and present danger" to the defendant's right to a fair trial by an impartial jury. *Id.* ¶¶ 6, 11, 16-17 ("If the court finds a clear and present danger, the court must *then* consider four constitutional factors before closing the proceedings . . . ." (emphasis added)). We concluded the defendant's concerns did not rise to the level required for court closure under Rule 9.3(b) and vacated the trial court's ruling. *KPNX*, 236 Ariz. 367, ¶¶ 10-18.

**¶33** While the trial court implemented the alternative mentioned by counsel, the record before us is, once again, insufficient to allow us to

determine whether the court adequately considered reasonable alternatives to closure as it was required to do by *Waller*. *Presley*, 558 U.S. at 214. Thus, we cannot conclude the third *Waller* element was satisfied.

## IV. Fourth *Waller* Element

¶34 Finally, when closing a courtroom to the public, a trial court "must make findings adequate to support the closure." *Waller*, 467 U.S. at 48. "[T]he function of a determination requirement is to provide this court with a sufficient record of the superior court's reasoning such that we may make an informed review of its decision." *State v. Perez-Gutierrez*, 255 Ariz. 232, ¶ 21 (App. 2023). "[A] court cannot neglect to make findings altogether or base its closure order only on broad or general observations." *Tucker*, 231 Ariz. 125, ¶ 21; *see also Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 13-14 (1986) (*Press-Enter. II*) ("[P]roceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" (quoting *Press-Enter. I*, 464 U.S. at 510)).

¶35 Dayton asserts there "were no findings here" nor any "evidence that the trial court had determined the extent of [S.K.]'s distress and whether it was sufficient to justify closure, and whether it had considered alternatives." He argues "[t]he problem . . . is not that the trial court failed to make exhaustive findings; it is that the trial court failed to make any findings beyond conclusory assumptions." In support of his argument, Dayton relies on *Tucker* for the proposition that, under *Waller*'s fourth element, "[b]road and general findings are insufficient" to support a closure order. 231 Ariz. 125, ¶ 19 (alteration in *Tucker*).

¶36 Relying on *People v. Turner*, 519 P.3d 353, ¶ 35 (Colo. 2022), the state contends "structural error doesn't flow simply from the trial court's failure to employ the precise language found in *Waller*." Quoting *Bell v. Jarvis*, it asserts "[c]learly established Supreme Court precedent governing courtroom closures does not require appellate courts to review closure orders in isolation of the record, nor does it mandate a conclusion that [a defendant's] public trial right was violated simply because the trial judge failed to recite exhaustively every fact and inference which justified the obvious." 236 F.3d 149, 174 (4th Cir. 2000) (alterations in original). Thus, the state argues, the record before us is sufficient for us to determine that the trial court's order was properly entered because the "*Waller* factors were implicitly rather than explicitly satisfied." *State v. Modtland*, 970 N.W.2d 711, 723 (Minn. Ct. App. 2022).

¶37          In *Tucker*, the trial court closed the courtroom to the public, including the defendants' families, over concerns that observers might have been taking photos of the jurors and intimidating them. 231 Ariz. 125, ¶¶ 4, 7, 15, 23. The court's decision was based on second-hand complaints from unidentified jurors that had been relayed to the bailiff. *Id.* ¶¶ 4, 23. The court never questioned the jury about these complaints, and the record contained "no testimony or evidence to support a finding that observers had been photographing witnesses or jurors." *Id.* ¶ 23. Further, court officers examined many observers' cell phones and found no evidence of juror photos. *Id.*

¶38          We concluded that "[b]road and general findings are insufficient" to satisfy *Waller*'s fourth element. *Id.* ¶ 19 (alteration in *Tucker*) (quoting *English v. Artuz*, 164 F.3d 105, 109 (2d Cir. 1998)); *see Guzman v. Scully*, 80 F.3d 772, 775 (2d Cir. 1996) (trial court relied solely on unsubstantiated statements by prosecutor that witness felt intimidated); *Commonwealth v. Penn*, 562 A.2d 833, 838 (Pa. Super. Ct. 1989) (trial court made "no findings whatsoever" regarding intimidation of witness and relied entirely on prosecutor's "second-hand, hearsay, rendition"); *McIntosh v. United States*, 933 A.2d 370, 379-80 (D.C. 2007) (court's general reference to child's vulnerability, alone, was not sufficient to satisfy fourth *Waller* element). Accordingly, in view of the trial court's failure to ensure a proper record to detail and demonstrate the threat to the jurors' and witnesses' security, we determined the closure was unconstitutional under *Waller*. *Tucker*, 231 Ariz. 125, ¶¶ 23-24.

¶39          We reach the same conclusion here. This case is not one in which the trial court merely failed to make exhaustive findings. To the extent the record can be viewed as containing any findings at all, they were at best general and conclusory in nature, and of the sort disapproved in *Tucker*. The fourth element of *Waller* was not satisfied. Further, the court's failure to make meaningful findings proved an insurmountable obstacle to our ability to fully assess whether the court had satisfied any of the *Waller* elements.

¶40          Our dissenting colleague agrees that the courtroom closure created structural error, but he disagrees with the remedy—the reversal of Dayton's convictions. Instead, he asserts the proper remedy is to remand this case to the trial court so it may determine in the first instance whether the *Waller* elements can be satisfied. If they can be satisfied, the dissent asserts, granting Dayton a new trial would amount to a "windfall."

¶41 The dissent relies heavily on the fact the *Waller* Court ordered a remand, and it cites *United States v. Galloway*, 937 F.2d 542 (10th Cir. 1991), which also resulted in a remand. Both are distinguishable. Additionally, the dissent asserts *Ring*, 204 Ariz. 534, ¶ 46, does not categorically prohibit remands in cases of structural error.

¶42 *Waller* arose from a Georgia trial court's decision to close a suppression hearing to "all persons other than witnesses, court personnel, the parties, and the lawyers" in order to protect sensitive information obtained by wiretaps. 467 U.S. at 41-42. In fact, the Court granted certiorari in *Waller* for the purpose of deciding "whether the defendant's Sixth Amendment right to a public trial applies to a suppression hearing." *Id.* at 43. After concluding the closure violated the Constitution, the *Waller* Court concluded a new trial was not required in Waller's case, stating, "If, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id.* at 49-50.

¶43 In this case, however, we assess the remedy for a structural error that occurred during the trial itself—not a pretrial hearing—and affected the conduct of the trial. The very fact that the structural error occurred during a jury trial requires us to presume the outcome of that trial was tainted—a circumstance that cannot be fixed without a new trial. *See Ring*, 204 Ariz. 534, ¶ 45. Notably, *Waller* logically required that the trial court entirely reconduct the very proceeding that had been affected by the improper closure of the courtroom. Here, that proceeding was the trial itself. Accordingly, full compliance with *Waller* compels the remedy of a new trial.

¶44 Further, a retrospective hearing of the variety suggested by the dissent would not involve merely conducting a second pretrial suppression hearing, which "often resembles a bench trial." *Waller*, 467 U.S. at 47. We see a marked difference between addressing the discrete issues in a second suppression hearing and attempting to reconsider a motion to close the courtroom made almost two years ago, *during* the victim's testimony in a jury trial, where the trial court failed to preserve an articulate, contemporaneous record of either the persons excluded or the witness's precise motivation for seeking their exclusion. Given the specificity required in assessing and weighing the *Waller* elements, the paucity of the record, and the passage of time, we are skeptical that the trial court could reliably conduct such a hearing.

¶45 Neither does *Galloway* support the dissent. There, the court remanded the "matter to the district court with directions to supplement the record with the findings upon which the *partial* closure of the trial was based." 937 F.2d at 549 (emphasis added). Because the case involved a partial closure, the court did not apply the *Waller* test in determining whether the closure was improper. *Id.* at 546 (applying different, less demanding standard "where the courtroom is only partially closed to the public"). As noted, Arizona applies *Waller* "to both complete and partial closures of Arizona criminal trials," *Tucker*, 231 Ariz. 125, ¶ 13, and here the state has withdrawn its partial closure argument. Further, in *Galloway*, the court concluded "the district court undoubtedly considered" the applicable "factors" in ordering the partial closure, 937 F.2d at 546, a conclusion we are not comfortable reaching given the lack of a record in this case.

¶46 Finally, assuming without deciding that our supreme court's unequivocal discussion of structural error in *Ring*, 204 Ariz. 534, ¶¶ 45-46, does not categorically prohibit the remedy of a remand for findings, as discussed above, such a remedy in this instance would be inherently unreliable. Thus, it would be inappropriate.

## Disposition

¶47 For the foregoing reasons, we reverse Dayton's convictions and sentences.

O' N E I L, Judge, dissenting:

¶48 Any violation of the right to a public criminal trial is structural error. *Ring*, 204 Ariz. 534, ¶ 46. The trial court closed this criminal trial without findings, and we must therefore presume prejudice as required by the United States Supreme Court in *Waller*. 467 U.S. at 48-50 & 49 n.9; *see also Tucker*, 231 Ariz. 125, ¶ 7. This closure was no mere technical violation of the public trial right. When S.K. struggled to testify, the prosecutor asked the court to remove "unnecessary" people and exclude the public from the courtroom during S.K.'s testimony. She argued, "If they're not necessary to be here, I don't know that they should be." The prosecutor cited no legal authority to support closure under the circumstances, simply urging that "it's still your courtroom, Your Honor." After defense counsel objected on "public policy" and "due process" grounds, the prosecutor admitted that S.K. had "[n]ot specifically" told her whether a closure would help, but avowed that in previous conversations S.K. had said it would "be easier if there are less people." On that record, and with a nod of S.K.'s head, the trial was closed.

**¶49** Leaving aside *Waller*'s particular requirements, the state's argument for closure trivialized the right to a public trial. Judges are not free to close proceedings simply by virtue of their right to control the courtroom. *Cf. Waller*, 467 U.S. at 45, 48 (circumstances when "right to an open trial may give way . . . to other rights or interests" are rare "and the balance of interests must be struck with special care"). A public criminal trial is a right expressly guaranteed by the United States and Arizona Constitutions. U.S. Const. amend. VI; Ariz. Const. art. II, § 24. It requires no further reason.

**¶50** Everyone involved treated the closure too casually. To its credit, the trial court limited its closure order to S.K.'s testimony and permitted partial public access through internet streaming of some kind. And to his credit, defense counsel objected to the closure. But the right to trial in open court is neither some obscure application of general due process principles nor a judicially crafted public policy provision. It is an explicit constitutional guarantee. U.S. Const. amend. VI; Ariz. Const. art. II, § 24.

**¶51** Trials are not public only for those whose presence is somehow necessary to the proceedings, and the public may not be excluded just because a witness—victim or otherwise—finds it easier. *Cf. Waller*, 467 U.S. at 48 & 49 n.9 ("While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real."). As our supreme court has put it, "the value of the public trial guarantee to the judicial system is incalculable." *Ridenour*, 179 Ariz. at 3. Any restriction of public access to the court during a criminal trial should produce a reflexive discomfort and healthy suspicion among courts and practitioners alike. It apparently failed to do so here. Dayton is entitled to relief. I dissent, but only to the form of that relief.

**¶52** We treat violations of the constitutional right to a public trial as structural error because in *Waller*, the Supreme Court concluded that a "defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." 467 U.S. at 49; *see also Tucker*, 231 Ariz. 125, ¶¶ 7-8. Citing *Waller*, therefore, our supreme court noted in *Ring* that denial of a public criminal trial is one of "relatively few instances" in which the Supreme Court "regard[s] error as structural," such that "the error infect[s] 'the entire trial process' from beginning to end." 204 Ariz. 534, ¶ 46 (quoting *Neder*, 527 U.S. at 8).

**¶53** In the course of that discussion, our supreme court acknowledged the general rule that in instances of structural error, "we

automatically reverse the guilty verdict entered." *Id.* ¶ 45. But although it included violations of the right to a public criminal trial in a list of structural errors, *Ring* did not otherwise discuss how the rule in *Waller* would apply to public trial violations in individual cases—especially when the principal error concerns a lack of findings. *See id.* ¶¶ 46-47, 53. *Ring* did not suggest that the Arizona Constitution treats either the concept of structural error or the denial of a public criminal trial differently than its federal counterpart. *See id.* ¶ 45. In *Tucker*, we likewise did not purport to expand, contract, or otherwise alter either the scope of the right or the appropriate remedy from what *Waller* requires. 231 Ariz. 125, ¶¶ 7-9, 24. Instead, we applied the requirements of *Waller* to the facts of that case. *Id.* ¶¶ 14-15, 17, 19, 24.

¶54        In both *Ring* and *Tucker*, our courts treated the denial of a public criminal trial as structural error solely because *Waller* defines it as such. *See Ring*, 204 Ariz. 534, ¶ 46 & n.16; *Tucker*, 231 Ariz. 125, ¶ 7; *see also Waller*, 467 U.S. at 49-50 & 49 n.9. Both cases simply adopted *Waller*'s interpretation of the public trial guarantee in the United States Constitution, and neither case redefined the right or the remedy according to any provision of Arizona law. *See Ring*, 204 Ariz. 534, ¶ 46 & n.16; *Tucker*, 231 Ariz. 125, ¶¶ 7-9, 24. There is no textual reason to treat either the right or the remedy differently under our state constitution. *See* U.S. Const. amend. VI; Ariz. Const. art. II, § 24. And as interpreted by *Waller*, the United States Constitution does not always or necessarily require a new trial as a remedy for a violation of the public trial right. 467 U.S. at 49-50.

¶55        In *Waller*, despite stating that a public trial violation requires relief even without a showing of prejudice, the Supreme Court expressly rejected the contention that the relief must always take the form of a new trial. *Id.* Rather, the Court concluded that "the remedy should be appropriate to the violation." *Id.* at 50. Relying on this portion of *Waller*, the Supreme Court has since noted again that "[i]n some circumstances, a constitutional violation may not require retrial." *Smith v. United States*, 599 U.S. 236, 242 n.2 (2023). In *Waller*, because the violation had occurred at a pretrial suppression hearing, the Supreme Court remanded the case for "a new, public suppression hearing." 467 U.S. at 48-50 & 50. And even though it was "clear" that "significant portions of a new suppression hearing must be open to the public," the Court "remand[ed] to the [trial court] to decide what portions, if any, may be closed." *Id.* at 50. The Court reasoned that "[i]f, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id.* Only if the new hearing resulted in a different outcome would a new trial be required. *Id.*

¶56 The Supreme Court's approach in *Waller* is consistent with its other decisions related to the public trial right. In *Globe Newspaper Co.*, the Court stated that in order "to deny the right of access . . . it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." 457 U.S. at 606-07. Addressing a trial court's improper closure of voir dire and refusal to release transcripts in *Press-Enterprise I*, the Court applied that standard and explained that closure requires "findings specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S. at 509-11. Similar to its remand in *Waller*, the Court did not order a new trial to correct the error. *See id.* at 513. Instead, it directed the trial court to make proper findings, consider reasonable alternatives to closure, and "seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected." *Id.*

¶57 Thus, when a trial court has made insufficient findings to allow for appellate review as required by the fourth element of the *Waller* test, the "appropriate remedy" is not necessarily a new trial but a remand to the court for appropriate findings. *See* 467 U.S. at 44, 48, 50. The first three elements of the test describe the substantive requirements for closure: the closure must protect an overriding interest that would likely be prejudiced without closure, the closure must be no broader than necessary, and the court must consider reasonable alternatives to the closure. *Id.* at 48. But the fourth element differs from the rest. *See id.* It requires the court to make specific findings on the record, sufficient to allow a reviewing court to determine whether the closure was constitutionally permissible under the first three elements. *See Tucker*, 231 Ariz. 125, ¶¶ 17, 19, 22-23. Where, as here, the court fails to make such findings, we are not permitted to "provide a post hoc rationale for why the trial judge would have closed the trial had it held a hearing and made findings." *Id.* ¶ 22. In this case, as the majority has aptly noted, "the court's failure to make meaningful findings proved an insurmountable obstacle to our ability to fully assess whether the court had satisfied any of the *Waller* elements."

¶58 The majority therefore concludes that the record is insufficient to identify an overriding interest under the first *Waller* element. Because the trial court made no findings to indicate the existence of an overriding interest likely to be prejudiced, I agree. The court's failure to identify an overriding interest means we are not free to supply one on appeal, but it does not mean no such interest existed. *See id.* The majority also concludes, under the second *Waller* element, the record is insufficient for us to determine whether the closure was broader than necessary. Again,

for similar reasons, I agree. But the closure was limited in time and scope, and had the court made a record as required under *Waller*, it is at least conceivable that the closure was appropriately narrow. Finally, as to the third *Waller* element, the record is silent as to whether the court considered alternatives. Absent findings on the record, only the court can know.

¶59 The situation here differs from *Tucker*, where, although the trial court also failed to make adequate findings to satisfy the fourth *Waller* element, we were able to determine from the record that the closure would not have satisfied other elements of the *Waller* test anyway. *See* 231 Ariz. 125, ¶¶ 15-19, 22-23. Thus, in that case, no other remedy short of a new trial would have sufficed to cure the violation. *See id.* ¶ 24. *Tucker* did not address a situation like this one, where the record is inadequate to determine whether the closure might have been justified upon a proper analysis of the three substantive elements of the *Waller* inquiry.

¶60 Under similar circumstances, where a public trial violation had occurred based on a trial court's failure to make findings on the record, the Tenth Circuit relied on *Waller* and concluded that "the appropriate course is to remand the case . . . with directions to supplement the record with the facts and reasoning upon which the partial closure of the courtroom was based." *Galloway*, 937 F.2d at 546-47 & 547. I would do the same here. Although we must presume prejudice from structural error, *Waller* calls for a remedy appropriate to the violation. 467 U.S. at 49-50 & 49 n.9. The majority points out that the improper closure in *Waller* occurred at a pretrial suppression hearing, and the Supreme Court ordered a new suppression hearing as a remedy. But the error in *Waller* went deeper than an absence of findings. It was substantive: "the closure was far more extensive than necessary." *Id.* at 49. Although *Waller* allowed the trial court discretion "to decide what portions, if any, may be closed" at a new suppression hearing, it foreclosed any possibility that the court might order the same closure that had applied to the previous suppression hearing. *Id.* at 50. As in *Tucker*, because the closure could not have been justified substantively even if the court had made findings, the appropriate remedy required a new, more open hearing. *Id.*

¶61 In this case, had the trial court conducted an adequate inquiry, the limited closure it ordered might have been justified. Our reversal for a new trial in no way precludes the court on remand from engaging in the required analysis under *Waller* and ordering the same partial closure it ordered the first time. The reasoning in *Waller* is equally compelling here. If the court makes detailed findings as required and

orders essentially the same closure after our remand, our order for a new trial will be a windfall. *See id.* at 50. As interpreted by the Supreme Court in *Waller*, the United States Constitution does not require that result. *See id.* Neither does any provision of our constitution or laws in Arizona. *See Ring*, 204 Ariz. 534, ¶ 46 & n.16; *Tucker*, 231 Ariz. 125, ¶ 7.

¶62 Remanding to the trial court for appropriate factual findings would protect the right to a public trial, avoid a potential windfall, and respect the trial court as the better venue for a proper case-specific analysis to determine the appropriate extent of any closure. The failure to make findings can be remedied on remand, supplying us with a basis for meaningful substantive review of whatever closure the court orders, if any. As in *Waller*, if the court enters different orders regarding closure after conducting the required analysis, Dayton would be entitled to a new trial. *See* 467 U.S. at 50. But if the court orders essentially the same closure after conducting a full analysis under *Waller*, complete with specific findings on the record, a new trial need not be held. The sole error having been remedied, no error would remain from which to presume prejudice. And in that case, the court's findings would permit future review.

¶63 Given the paucity of the record in support of closure here, it is doubtful the trial court could support its closure order merely by making findings based on the prior proceedings. More likely, an evidentiary hearing would be required. *See Tucker*, 231 Ariz. 125, ¶ 21. The majority is "skeptical that the trial court could reliably conduct such a hearing." But that is what trial courts do. If the court determines the closure cannot be reliably supported even with additional evidence, it can set a new trial. But the factual inquiries necessary for a *Waller* inquiry are well defined, and the trial court is in the better position to discern the reliability of whatever evidence might be introduced at a hearing. Such a hearing may pose any number of difficulties, as many evidentiary hearings do. It is far from certain that the evidence would ultimately support the closure as previously ordered. We must trust the court, however, to make that determination in the first instance. *See id.* ¶ 22. Indeed, after our remand for a new trial, it will do so anyway.